999 F.2d 1053
 38 Fed. R. Evid. Serv. 881
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert PHIBBS (92-5509); Victor Rojas (92-5512/92-5523);
Diane Whited (92-5521); Robert Dale Murr
(92-5522/92-5730); Raymond Huckelby
(92-5529), Defendants-Appellants.
 Nos. 92-5509, 92-5512, 92-5521 to 92-5523, 92-5529 and 92-5730.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 7, 1993.
Decided Aug. 5, 1993.
Rehearing and Suggestion for Rehearing En Banc Denied in
Nos. 92-5522 and 92-5730 Oct. 4, 1993.
 
 James E. Arehart, Asst. U.S. Atty., Karen K. Caldwell, U.S. Atty., Frances E. Catron, Asst. U.S. Atty. (argued and briefed), Office of U.S. Atty., Lexington, KY, Jacquelyn A. Jess, Asst. U.S. Atty., Office of U.S. Atty., Covington, KY, for plaintiff-appellee U.S.
 Andrew M. Stephens (argued and briefed), Lexington, KY, for defendant-appellant Robert William Phibbs.
 Fred E. Peters (argued and briefed), Lexington, KY, for defendant-appellant Victor Manuel Rojas.
 David R. Marshall (argued and briefed), Lexington, KY, for defendant-appellant Diane Whited.
 Ann C. Short (argued), Herbert S. Moncier (briefed), Knoxville, TN, for defendant-appellant Robert Dale Murr.
 Derek G. Gordon (argued and briefed), Anggelis, Philpot, Gordon, & Simpson, Lexington, KY, for defendant-appellant Raymond Eugene Huckelby.
 Before: GUY and SUHRHEINRICH, Circuit Judges, and DOWD, District Judge.*
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Defendants, Raymond Huckelby, Diane Whited, Robert Phibbs, Victor Rojas, and Robert Murr appeal their convictions arising from their participation in a cocaine distribution ring operating in Tennessee and Kentucky. In addition, Phibbs and Rojas challenge the appropriateness of their sentences.
 
 
 2
 Huckelby takes issue with the sufficiency of the evidence supporting his convictions. Along with the other defendants, he also expressly adopts and incorporates by reference all common issues raised by his co-defendants.
 
 
 3
 Whited raises the following allegations of error: (1) her convictions were not based upon sufficient evidence; (2) the district court should have granted a mistrial as a result of prejudicial statements made by a government witness; (3) the court should have severed a co-defendant who was tried in absentia; (4) the government was improperly permitted to elicit certain evidence that was prejudicial to the defense; (5) two key government witnesses should have been declared incompetent to testify; and (6) the court unduly restricted her ability to cross-examine a government agent.
 
 
 4
 Phibbs alleges that: (1) the district court's approach to the voir dire of the jury venire was in error; (2) two government agents were improperly allowed to remain in the courtroom throughout the proceedings, despite the fact that they served as witnesses; (3) the evidence underlying his convictions was insufficient; and (4) he should have been afforded a reduction in sentence due to his acceptance of responsibility for his offenses, as well as for his "minimal" role in the drug distribution ring.
 
 
 5
 Rojas argues the following points: (1) the government misused both its grand jury and its administrative subpoena powers; (2) the district court erroneously denied both his motion in limine to suppress evidence of his Colombian origins, as well as his mistrial motion predicated upon prejudicial references to his Colombian ties; (3) he was not provided with a "photospread" used by a government witness in her pre-trial identification of him; (4) he was improperly deprived of confidential presentence information; and (5) the district court should have given him a reduction in sentence due to his acceptance of responsibility for his offenses.
 
 
 6
 Murr contends that: (1) the government breached the terms of a pre-existing plea agreement with him, leading to his prosecution in the instant case; (2) the evidence presented at trial was insufficient to sustain his convictions; (3) the district court erred in denying him a bill of particulars in relation to his continuing criminal enterprise charge, as well as in refusing to give the jury special instructions requested by him; and (4) the government failed to turn over vital Brady and Jencks Act evidence to the defense.
 
 
 7
 We affirm the convictions and the sentences of all five defendants.
 
 I.
 
 8
 On February 23, 1990, Jerry Parks was detained by agents of the FBI in Nashville, Tennessee, in connection with an ongoing drug investigation. After discussions with the government, he agreed to cooperate in the probe.
 
 
 9
 Parks revealed that his friend, Robert Murr, had visited him a number of times during the summer of 1988 when Parks was residing in a federal "halfway house" in Bowling Green, Kentucky. On some of those occasions, Murr would deliver cocaine to him to sell. Murr wanted Parks to come to Knoxville, Tennessee, to work for him in his drug distribution venture. He directed Robert Phibbs, who was on the payroll of one of Murr's legitimate businesses, Automotive Enterprises, to write a letter to Parks' federal probation officer requesting that he be allowed to transfer to the Knoxville area. Murr told Phibbs to promise the probation authorities that Parks would be provided with a job at Automotive Enterprises. His efforts were rewarded, and Parks was permitted to move to Knoxville.
 
 
 10
 Parks' position at Automotive Enterprises was a subterfuge; he actually spent his time helping Murr distribute cocaine. In August of 1988, Murr arranged to sell four kilograms of cocaine to Billie Dye and David Hurt. Parks and Dye gathered approximately $100,000 in cash and, pursuant to Murr's instructions, started out for Lexington, Kentucky, where they were to meet with Murr. The pair had car trouble, however, and arrived in Lexington several hours late. After checking into a hotel, Parks called Murr's ex-wife, Judy, the following morning for guidance as to what to do next. Based on his conversation with her, he and Dye returned to Knoxville, where the transaction was consummated the next day.
 
 
 11
 Beginning in September of 1988, Parks travelled with Murr and another drug dealer named Tommy McKeehan to the Lexington area every few weeks to obtain multi-kilogram quantities of cocaine. During the first such trip, Parks became acquainted with Murr's drug source, Kenneth Lawson. Whenever Murr needed cocaine, he went with McKeehan to a pay telephone and called Lawson. After a deal had been struck, Murr, Parks, and McKeehan would meet at Judy Murr's residence early in the morning before leaving for Kentucky. Murr and McKeehan would then organize the money to be used in the sale into $1,000 bundles, putting these stacks in brown paper bags.
 
 
 12
 Aside from taking part in these trips, Parks served as the "front man" for the drug distribution ring. Murr introduced Parks to his regular cocaine customers, including Raymond Huckelby and Edward Rogers. At such meetings, Murr would instruct Parks with regard to the amount of cocaine to be supplied, the price of the drug, and how often it was to be furnished. He would then tell Parks and the purchaser to exchange telephone numbers, beeper numbers, and beeper codes in order to stay in contact. For several months, Parks delivered drugs to Murr's customers in this fashion. When Murr was unavailable, Parks would turn over the money he received in return to either Phibbs or to Judy Murr.
 
 
 13
 In October of 1988, Parks first encountered Victor Rojas while on one of the excursions to Kentucky he made with Murr and McKeehan to buy cocaine. Rojas, who was Lawson's supplier, brought the drugs to the location where the sale would take place. He usually drove a red Jeep, hiding the drugs in the back inside one or more shopping bags, and wrapped in separate kilogram packages. The bags were covered in coffee grounds to mask the odor of the cocaine.
 
 
 14
 Parks, Murr, and McKeehan would either give their money to Lawson or would leave it in Rojas' vehicle, taking the cocaine for which they had paid. McKeehan would then be given his share. After the drugs were driven back to Knoxville, Parks and Murr stashed them at the house Murr rented for his girlfriend, Diane Whited. She stored the cocaine in the attic in a green duffel bag with a padlock on it. In order for Parks to get the cocaine from Whited's house to distribute, he would have to contact Murr who, in turn, would call Whited to set up a time for the two of them to come over. Parks went to Whited's residence 15 to 20 times in the fall of 1988 to pick up drugs. On at least one occasion, Whited assisted Murr and Parks in breaking down the cocaine into salable quantities.
 
 
 15
 Keeping the cocaine at Whited's house proved to be unworkable because Parks needed ready access to the stash, and Murr would not let Parks enter the house without him. At the end of November of 1988, Murr told Parks to bury the cocaine in a pipe on the side of a hill behind Automotive Enterprises. The only person besides Parks who knew exactly where the drugs were hidden was Phibbs.
 
 
 16
 The drug distribution ring was so successful that Murr and Lawson talked about what should be done with the rather substantial profits. Murr recognized that he could "launder" some of the funds through his business partner, Ernie Nicely. The companies that he had established with Nicely were not doing well, so Murr began to funnel money to him to keep them afloat. Nicely understood that the bulk of this money was derived from drug sales.
 
 
 17
 After November of 1988, Murr no longer wanted to accompany Parks and McKeehan to Kentucky to obtain cocaine. Consequently, he sent the two of them alone to complete deals in February, March, April, and May of 1989. Around the time of the May transaction, Rojas began to get nervous about the way in which the meetings were scheduled. He approached McKeehan and gave him a slip of paper with a telephone number on it, imploring him and Parks to contact him directly in the future. When they returned to Knoxville, McKeehan asked Murr whether it would be permissible to bypass Lawson in light of Rojas' overtures. Murr indicated that this was acceptable to him. Approximately 10 days later, Parks and McKeehan set up a transaction with Rojas in the manner he suggested.
 
 
 18
 Shortly thereafter, on May 22, 1989, the Knoxville police arrested Parks for burglary. He was wounded while in the process of being apprehended. The authorities subsequently seized a set of electronic scales and six address books from him. One of these books contained records of Parks' drug-related activities that month, and included a coded list of some of Murr's customers, as well as a description of the drug ring's cocaine inventory.
 
 
 19
 Despite Parks' arrest, the drug ring continued to operate. Jim Hurt soon took over some of Parks' functions, delivering cocaine for Murr to Edward Rogers, and possibly others. However, when Rogers complained about the poor quality of the cocaine that Hurt was selling him, Murr began to personally supply Rogers. This continued until August of 1989, when Murr himself was arrested on federal drug charges. Afterwards, Phibbs tried to collect money from Rogers which he claimed Rogers owed Murr for drugs.
 
 
 20
 On April 11, 1990, Vivian Cummins observed three men sitting inside the Berea, Kentucky, restaurant where she was employed. They had been drinking coffee for over three hours, and were watching cars pass by on the adjacent highway, Interstate 75. They were eventually joined by a fourth man, later identified as Victor Rojas. Not long after Rojas arrived, Cummins saw the group leave the restaurant and gather in the parking lot around two vehicles, one of them a black Mercedes-Benz. When two of the men quickly exchanged packages, she became suspicious and called the local police.
 
 
 21
 Rojas and Kenneth Lawson, who was another of the individuals Cummins noticed in the restaurant, were riding in a black Mercedes-Benz when it was stopped by two Berea police officers. Rojas told the officers that he was in Kentucky to sell parts for electric signs. Lawson, however, claimed that he did not know Rojas.
 
 
 22
 The car was ultimately searched by the Kentucky State Police, who uncovered $124,500 in United States currency. The money was wrapped in $1,000 packets with colored rubber bands. The $1,000 bundles were combined into packages of $5,000 in several small brown lunch-type bags, a grocery bag, and a white plastic bag. These bags were then stuffed into a cardboard box which was taped shut. The box was then placed inside a brown shopping bag with handles. In addition to discovering the cash, the state police detected coffee grounds on the pavement beneath the car, on the bumper of the vehicle, and inside the brown shopping bag. A DEA chemist tested the shopping bag for the presence of controlled substances, and determined that it contained traces of cocaine.
 
 
 23
 Murr had entered into a plea agreement with the government in January of 1990 in the Eastern District of Tennessee. It was not until Parks had been questioned in late February of 1990 that the government became aware of Murr's cocaine venture extending into Kentucky. At that time, Parks had spoken of a individual named "Tony" who, with the assistance of Kenneth Lawson, furnished cocaine to Murr's drug distribution ring. After the events of April 11, 1990, Parks realized that "Tony" was actually Victor Rojas.
 
 
 24
 On May 2, 1990, a federal grand jury returned a one-count indictment charging Rojas with possession of cocaine with the intent to distribute the drug, pursuant to 21 U.S.C. § 841(a)(1). Upon motion of the government, the district court ordered the indictment and any subsequent pleadings sealed. In the fall of 1990, the FBI could not determine the whereabouts of Rojas. Consequently, on October 10, 1990, the district court approved the issuance of a bench warrant for his arrest.
 
 
 25
 On March 13, 1991, a federal grand jury returned a 13-count superseding indictment against Victor Rojas, Robert Murr, Robert Phibbs, Diane Whited, Raymond Huckelby, and eight other defendants, including Billie Dye, David Hurt, Kenneth Lawson, Tommy McKeehan, Mary Lawson, William Baird, Reba England, and Edward Rogers. A trial date was set for September 9, 1991.
 
 
 26
 The indictment, which was unsealed two weeks later, charged the 13 defendants with conspiring to possess cocaine with the intent to distribute the drug, in violation of 21 U.S.C. § 846. It also charged each of them with 11 counts of cocaine distribution, or aiding and abetting such distribution, in accordance with 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The incidents underlying these counts purportedly took place between August 25, 1988, and April 11, 1990. In addition, Murr was alleged to have operated a continuing criminal enterprise as defined under 21 U.S.C. § 848.
 
 
 27
 Kenneth Lawson failed to appear for trial in September of 1991, and a bench warrant for his arrest was handed down. McKeehan, Rogers, and David Hurt reached plea agreements with the government and took the stand against their co-defendants. Billie Dye and Reba England also plea bargained. Mary Lawson moved for a judgment of acquittal, which was granted by the district court. On October 9, 1991, the jury found Rojas guilty on all 12 counts against him. Huckelby and Phibbs were both convicted of conspiracy and on nine distribution counts. Whited was convicted of conspiracy and on three distribution counts. Murr was found guilty of conspiracy, managing a continuing criminal enterprise, and on 10 distribution counts. Kenneth Lawson, who was tried in absentia, was convicted of conspiracy and on 10 distribution counts. William Baird, who had been partially successful on a motion for judgment of acquittal, was found not guilty of the remaining charges against him.
 
 II.
 Raymond Huckelby
 Sufficiency of the Evidence
 
 28
 Huckelby contends that the evidence presented at trial was insufficient to support his conviction for conspiracy to possess cocaine with the intent to distribute the drug (21 U.S.C. § 846); as well as on nine counts of possession of cocaine, or aiding and abetting the possession of cocaine, with the intent to distribute (21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2).
 
 
 29
 The standard of review for claims of insufficient evidence is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Evans, 883 F.2d 496, 501 (6th Cir.1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in original).
 
 
 30
 In order to obtain a conviction pursuant to 21 U.S.C. § 846, "the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join and participated in the conspiracy." United States v. Pearce, 912 F.2d 159, 161 (6th Cir.1990) (quoting United States v. Stanley, 765 F.2d 1224, 1237 (5th Cir.1985)). No formal or express agreement is necessary to establish a conspiracy under § 846. United States v. Hughes, 891 F.2d 597, 601 (6th Cir.1989). "[A] tacit or mutual understanding among the parties" is enough. Id.
 
 
 31
 The essential elements of a violation of 21 U.S.C. § 841(a)(1) are "for any person knowingly or intentionally to ... possess with intent to ... distribute ... a controlled substance." See United States v. Pope, 561 F.2d 663, 669 (6th Cir.1977). "To be found guilty of the crime of aiding and abetting a criminal venture [18 U.S.C. § 2], a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed." United States v. Knox, 839 F.2d 285, 294 (6th Cir.1988).
 
 
 32
 At trial, Jerry Parks testified that in September of 1988, defendant Robert Murr introduced him to a number of individuals "for the distribution of cocaine in [Murr's] network." The first person that Parks met through Murr was Huckelby. Parks and Murr went to Huckelby's jewelry store in Knoxville, Tennessee, where they were taken into a back room to meet with him. While in the rear of the store, Murr asked Parks whether he and Huckelby would "ha[ve] any problem dealing with each other." Parks replied in the negative. Murr then told Huckelby "who [Parks] was and how long he'd known [him] and asked if he had any problem dealing with [Parks.]" Id. Huckelby said that he did not. Afterwards, Huckelby and Parks "exchanged telephone numbers, beeper numbers and codes." Murr informed Parks that he would be delivering ten ounces of cocaine at a time to Huckelby at a price of $1,000 an ounce. Parks testified that, after this initial introduction, he regularly provided ten-ounce quantities of cocaine to Huckelby and received cash in return. The drugs were obtained by Murr and his associates by way of Kentucky, and were transported to co-defendant Diane Whited's residence in Knoxville for storage.
 
 
 33
 Parks' testimony was corroborated by information contained in one of the books seized from his residence when he was arrested for burglary in May of 1989. Parks confirmed that the book contained records of drug transactions that took place between April 10, 1989 and May 21, 1989. He had kept similar records before that time, but Murr told him to destroy them "as soon as the drugs were paid for and out of our possession." According to Parks, ledger entries indicated that, on May 15, 1989, ten ounces of cocaine were distributed to Huckelby, who was referred to in the book as "Huck."
 
 
 34
 In addition, an address book taken from Parks' residence listed Huckelby's home, office, and beeper telephone numbers. Parks testified that he did, in fact, contact Huckelby by telephone between August 1988 and May 1989 regarding cocaine purchases. To buttress his testimony, the government introduced telephone records showing that, from August through November of 1988, as well from February through May of 1989, calls were placed on Murr-related telephones to Huckelby's office and beeper numbers. During the same periods, calls were made from Murr-related telephones to several of Huckelby's co-defendants.
 
 
 35
 Huckelby's conversation in the back of his jewelry store with Parks and Murr gave rise to the inference that he was well aware he was obtaining cocaine as part of a group venture. It demonstrated that he was not simply a street buyer engaging in a discrete transaction, but that he knew he was involved in an ongoing conspiracy of some dimension. That Murr told Parks that Huckelby was part of his drug distribution network, and the fact that Parks delivered significant quantities of cocaine to Huckelby at regular intervals, suggested that Huckelby indeed had such an understanding. See United States v. Baker, 905 F.2d 1100, 1106 (7th Cir.), cert. denied, 498 U.S. 876, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990) (holding that, while mere buyer/seller relationship alone does not support conspiracy conviction, evidence of "repeat purchases or some other enduring arrangement that implies knowledge of the scope of the conspiracy" may suffice). His telephone records, as well as Parks' books, provided additional proof that Huckelby was caught up in the affairs of the charged conspiracy.
 
 
 36
 While some of this evidence was circumstantial in nature, even circumstantial evidence standing alone may sustain a conviction so long as the totality of the evidence was substantial enough to establish guilt beyond a reasonable doubt. See United States v. Green, 548 F.2d 1261, 1266 (6th Cir.1977). We are satisfied that this standard was met and find there was sufficient evidence that Huckelby knew of, intended to join, and participated in the conspiracy.[1] He therefore assumed responsibility for every act committed to further its objectives which was reasonably foreseeable. See United States v. Martin, 920 F.2d 345, 348 (6th Cir.1990).
 
 
 37
 With regard to Huckelby's violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, Parks described how he, Murr, and defendant Tommy McKeehan travelled to Kentucky every few weeks from September 1988 through May 1989 (the time frame of the counts upon which Huckelby was found guilty) to purchase cocaine from defendants Kenneth Lawson and Victor Rojas. Parks told the jury that the drugs sold to Huckelby were procured during these trips. The entries in Parks' books were consistent with his account of Huckelby's culpability, as were Huckelby's telephone records. Accordingly, the government showed that Huckelby, as a marketer of cocaine, "associate[d] himself" with the drug distribution ring and "[sought] by his acts to make it succeed." Knox, 839 F.2d at 294.
 
 
 38
 Huckelby nonetheless calls our attention to Parks' psychiatric history and his role as a government informant, apparently in an attempt to have us reassess his credibility. This we will not do. Credibility determinations are the province of the trier of fact, and are not to be disturbed on appeal when considering the sufficiency of the evidence underlying a defendant's conviction. Parks' alleged deficiencies as a witness were amply explored in the course of cross-examination.
 
 III.
 Diane Whited
 A. Sufficiency of the Evidence
 
 39
 Whited was convicted of conspiracy to possess cocaine with the intent to distribute the drug (21 U.S.C. § 846), as well as on three counts of possession of cocaine, or aiding and abetting the possession of cocaine, with the intent to distribute (21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2). The latter convictions were the result of conduct which occurred in September, October, and November of 1988. She challenges the sufficiency of the evidence sustaining the guilty verdicts returned against her.
 
 
 40
 At trial, Jerry Parks testified that defendant Robert Murr rented a house in the Martha Washington Heights subdivision in Knoxville, Tennessee, for Whited, who was his "girlfriend." Murr and Parks would store a large portion of the cocaine they bought in Kentucky there. In September of 1988, they went to the house for such a purpose. According to Parks, he and Murr
 
 
 41
 went upstairs and took the cocaine into a bedroom, and [Murr] told Diane Whited to go into the other room and to get the stash. She was gone a few minutes. I heard her pull out an exit door in the hallway. She climbed up in the step, secured a green duffle bag, which had a padlock on it, and brought it into the bedroom. Mr. Murr had a key on his key ring. He opened up a lock on the duffle bag and pulled out two PVC pipes. We opened it up and put one of the kilos of cocaine in there. He told Ms. Whited to go into the kitchen or wherever she kept her bags and got baggies and roll of aluminum foil and brought back in the bedroom. Mr. Murr had a pair of scales there, digital scales, and we weighed the cocaine. We put [it] in one ounce bags, put green rubber bands around it, wrapped it up, put tinfoil around that, put it back in PVC pipes, secured the lids on it, put [it] back in the green duffle bag, locked that, put it back in the attic.
 
 
 42
 Parks recalled that it was Whited who took the cocaine and hid it in the attic.
 
 
 43
 Parks testified that he and Murr were "probably over" at the house with Whited "15, 20 times" through the fall of 1988. When questioned in greater detail, he confirmed that in September, October, and November of 1988, they brought cocaine "to the stash house, Diane Whited's stash house," where it was broken down in "pretty much the same manner" and later distributed.
 
 
 44
 In order for Parks to remove cocaine from the house to sell, he would have to call Murr "and make arrangements to meet him to go out to the house in Martha Washington Heights.... Sometimes Ms. Whited would be at home, sometimes she wouldn't." Parks was not allowed to go there by himself. He and Murr "would drive to the area. [Murr] would use his cellular phone. And if [Whited] was there, she would open the door"; otherwise, Murr would use his keys to enter the house. This arrangement became unworkable after November of 1988 because Parks needed easier access to the cocaine supply, and it was at this point the drugs were buried in a pipe on property behind Automotive Enterprises.
 
 
 45
 Gene Doss, a long-time resident of the Martha Washington Heights subdivision, testified that Murr and Whited called themselves "Don Stallings" and "Janet Stallings" during the time they spent there. Doss described the basement windows of Whited's house as "covered with some sort of material," as were the garage door, the entrance door, and a third door. There were fish-eye peepholes in the windows and the doors. He also remembered seeing a large safe being taken out of the residence.
 
 
 46
 Viewing the evidence in the light most favorable to the government, a rational jury could have concluded that Whited "knew of, intended to join and participated in the conspiracy." Pearce, 912 F.2d at 161 (quoting United States v. Stanley, 765 F.2d 1224, 1237 (5th Cir.1985)). She consciously handled and concealed the cocaine stored at her residence, exercising dominion and control over the drugs. In fact, she was entrusted with their safekeeping for a number of months. Doss' testimony concerning Whited's alias and her home security measures further indicated that she was not merely associated with members of the drug distribution ring, but played an active role in the enterprise. Similarly, evidence was educed that she possessed at least a kilogram of cocaine on or about the dates set out in the counts upon which she was convicted. The intent to distribute could be inferred from such a large amount of drugs. See, e.g., United States v. Welebir, 498 F.2d 346 (4th Cir.1974).
 
 
 47
 B. Mistrial Based Upon Jerry Parks' Statements
 
 
 48
 Whited also argues that the district court should have granted defendants' motion for a mistrial following remarks made by Jerry Parks on cross-examination.
 
 
 49
 Parks was questioned by Robert Murr's counsel regarding the $35,000 to $40,000 he estimated he was paid by the government to compensate him for his services and his expenses. In explaining what the money was used for, and why he was uncertain whether his estimate was correct, he told the jury that
 
 
 50
 [a] lot of this money, and I don't know whether it is listed here or not, is for my protection. I have been threatened by these witnesses. I have been threatened by the defendants and their wives. I have been threatened by several people. I actually recorded ... [r]ecorded threats, who has a contract on me. I had to move. I had to get more money from the FBI. I don't know whether this represents all of it or not. I am telling you I spent a lot of their money. This is what they say I spent. I don't know whether this is extra money, whether this represents every single nickel I got from the FBI. I spent a lot of money.
 
 
 51
 After Parks finished his statement, Murr's counsel did not raise an objection but continued his line of questioning.
 
 
 52
 At the close of the day's proceedings, defendant Mary Lawson's attorney moved for a mistrial on the basis of Parks' remarks concerning the threats he allegedly received from defendants and their spouses. The other defendants subsequently joined the motion. The district court replied:
 
 
 53
 Now, in regard to Mr. Parks' response, it was in response to the cross-examination of him being paid all this money. The inference being raised to the jury, well, you know, that's a lot of walking around money, 35, $40,000. That's outrageous. Why would the Government be paying you all kinds of money like that for services and/or expenses? And I allowed him to defend himself. This was in response to cross-examination, direct response as to why it would take 35 or $40,000. And that's what he has to say. That's what he had to say. It may not be true. The jury may not believe it.
 
 
 54
 But, Mr. Hicks, the books are full of cases where threats have been made, glaring, intimidating looks have been made in order to--and witnesses have been murdered, witnesses have been murdered. And that is--if that happens, it is competent, it is relevant, and the circuits have upheld that kind of testimony for as long as I can remember.
 
 
 55
 So your motion for mistrial is overruled.
 
 
 56
 Lawson's counsel went on to express surprise that the district court would allow "bald assertion[s]" of threats and intimidation into evidence. The court, however, opined that it "allowed the testimony to come in for what it's worth.... It goes to the weight of the testimony and not its admissibility." When Lawson's counsel persisted in claiming that Parks' statements were unfounded, the court asked: "You want me to have Mr. Parks go into it again tomorrow morning in more detail to see if there is a factual basis in front of this jury?" Lawson's counsel answered in the negative; instead, he wanted the jury admonished that Parks' "bald assertion that these defendants tried to kill him is not to be used as far as Mary Lawson is considered." The court refused, and also refused similar requests by the other defendants.
 
 
 57
 "A defendant may move for a mistrial where there is a legitimate claim of seriously prejudicial error," such that the defendant is unable to obtain a fair trial. United States v. Moore, 917 F.2d 215, 220 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1590, 113 L.Ed.2d 654 (1991). "The denial of a mistrial is generally within the discretion of the trial court," and our review of the court's ruling is confined to whether the trial court abused its discretion. Id.
 
 
 58
 Here, the government did not elicit the allegedly prejudicial statements and did not repeat them. See, e.g., United States v. Tarantino, 846 F.2d 1384, 1413 (D.C.Cir.1988). Significantly, defendants did not make a contemporaneous objection to the remarks on grounds of prejudice, or on any other grounds. As the district court pointed out, the remarks might not have been prejudicial at all. They were surely not what defendants wanted to hear, but they were offered as a legitimate response to a question concerning substantial payments to Parks by the government. The existence of these payments might well have damaged his credibility, if not justified to the jury's satisfaction. Parks' claim of threats was not wholly implausible on its face; such incidents have been known to occur. Defendants had an opportunity to challenge the veracity of the claim; they deliberately chose not to take up the cudgel. While certain statements are so prejudicial that the defense should not be required to rebut them, and the jury should not be left to weigh their value, we are convinced that the instant case did not involve such a situation.
 
 
 59
 We also note that, in the case at bar, the remarks at issue "constitute[d] but a small portion of the total testimony at trial." United States v. Bowers, 739 F.2d 1050, 1055 (6th Cir.), cert. denied, 469 U.S. 861, 105 S.Ct. 195, 83 L.Ed.2d 128 (1984). They were made well before the start of the jury's deliberations, deliberations which produced not guilty verdicts on several of the counts charged in the indictment. For all of these reasons, we hold that the district court did not abuse its discretion in denying defendants' mistrial motion.
 
 C. Motion to Sever Defendant Kenneth Lawson
 
 60
 A motion was made by Robert Murr to sever defendant Kenneth Lawson prior to trial, when it appeared that Lawson would not be present for the proceedings. This motion was denied by the district court, and Whited contends that this was in error.
 
 
 61
 A district court's denial for severance is reversible only for an abuse of discretion. United States v. Warner, 690 F.2d 545, 552 (6th Cir.1982). "Once defendants have been properly joined under Federal Rule of Criminal Procedure 8(b), a 'strong showing of prejudice' is required to justify severance." United States v. Hessling, 845 F.2d 617, 619 (6th Cir.1988) (quoting United States v. Reed, 647 F.2d 678, 689 (6th Cir.), cert. denied, 454 U.S. 837, 102 S.Ct. 142, 70 L.Ed.2d 118 (1981)). The jury must be unable "to decide fairly and separately the guilt or innocence of each defendant." Moore, 917 F.2d at 220.
 
 
 62
 Whited argues that defendants were harmed because the jury might have inferred that Lawson did not show up for trial because he was guilty, and then concluded that his co-defendants must also be culpable. In addition, Whited asserts that they were prejudiced when the jury was exposed to extensive testimony concerning Lawson's activities, while "no one was there to challenge this testimony."
 
 
 63
 "As a general rule, persons jointly indicted should be tried together." United States v. Stull, 743 F.2d 439, 446 (6th Cir.1984). This is because there is almost always common evidence against the joined defendants that allows for the economy of a single trial. In the instant case, a large portion of the evidence presented, including that related to Lawson, was applicable to each defendant to show the scope of the charged conspiracy. While Lawson was not there to "challenge" his alleged participation at trial, his co-defendants had the opportunity to convince the jury that they were not associated with him. "Absent a showing of substantial prejudice, spillover of evidence from one case to another does not require severance." Moore, 917 F.2d at 221 (relying upon United States v. Gallo, 763 F.2d 1504, 1526 (6th Cir.1985)). Defendants have not made such a showing here.
 
 
 64
 The fact that a defendant sought to escape prosecution is usually relevant in establishing culpability, so we understand Whited's anxiety about "transferred guilt" due to Lawson's flight. However, the district court neutralized any adversity Lawson may have caused his co-defendants by his actions. It gave a cautionary instruction that each defendant's case was to be considered separately and, further, that Lawson's flight could not be used as evidence against anyone but him. The jury appears to have heeded the court's admonition, as defendant William Baird, allegedly a close companion of Lawson's, was acquitted of conspiracy. Other defendants were acquitted on some of the distribution counts brought against them. Thus, the jury was plainly able to view them as distinct individuals in rendering its verdicts. As this was so, the district court did not abuse its discretion in denying the motion to sever Lawson.
 
 
 65
 D. The Government's Use of Prejudicial Evidence
 
 
 66
 Whited next contends that the government elicited, or sought to elicit, a variety of evidence that was prejudicial to defendants, thereby warranting reversal.
 
 
 67
 Specifically, she asserts that the government repeatedly sought to admit testimony related to meetings in Tennessee and Virginia where cocaine allegedly was obtained from Kenneth Lawson and Victor Rojas. As this evidence was never presented to the jury, defendants suffered no harm.
 
 
 68
 Whited also takes issue with the government being permitted to present testimony that cocaine was acquired by Jerry Parks from Robert Murr while Parks was living at a halfway house in Bowling Green, Kentucky. The district court, however, allowed such evidence to establish the beginning of Parks' dealings with Murr. In our view, this was proper.
 
 
 69
 Additionally, Whited argues that the "defense was left helpless ... to rebut the inflammatory nature" of Jerry Parks' testimony regarding threats allegedly made to him by defendants and their spouses. She seems to claim that the government should have either substantiated the allegations or sought to counteract their effect. We have already determined that reversal is not required as a result of Parks' statements.
 
 
 70
 Whited also complains that she and her co-defendants were harmed by the government's questioning of witness Ernie Nicely regarding loans allegedly extended to Robert Murr and his ex-wife, Judy, and promissory notes memorializing those loans. The district court struck Nicely's testimony on the basis of a pretrial ruling excluding such evidence. The trial judge cautioned the jury to disregard the testimony, and we believe that he cured any harm to defendants in doing so.
 
 
 71
 Finally, Whited contends that defendants were prejudiced both by statements from Nicely that Robert Murr was arrested on the same day he was seen with co-defendant Kenneth Lawson, and from witness Donald Bennett that Murr was incarcerated. However, the district court instructed the jury to disregard these remarks, which abated any prejudice.
 
 
 72
 E. Competency of Jerry Parks and Tommy McKeehan
 
 
 73
 Whited claims that witnesses Jerry Parks and Tommy McKeehan were incompetent to give testimony on grounds of mental incapacity. In the case of Parks, he had previously been found incompetent to stand trial, had a history of auditory delusions, and had spent time in mental health facilities. As for McKeehan, Whited cites an affidavit filed with the district court by his treating psychiatrist that he could not assist his counsel in an upcoming trial because he suffered from "confusion, agitation, paranoia and hallucinations." This affidavit was dated four days prior to McKeehan having entered into a plea agreement with the government. Because of such information, Whited contends that, at the very least, it was error for the court not to conduct a preliminary examination of Parks' and McKeehan's competency as witnesses.
 
 
 74
 Under Rule 601 of the Federal Rules of Evidence (General Rule of Competency), "[e]very person is competent to be a witness except as otherwise provided in these rules." The Advisory Committee Notes to Rule 601 explain that "[t]his general ground-clearing eliminates all grounds of incompetency not specifically recognized in the rules of this Article." Accordingly, "[n]o mental or moral qualifications for testifying as a witness" are specified. Id. This is because "[s]tandards of mental capacity have proved elusive in actual application." Id.
 
 
 75
 Thus, the Federal Rules of Evidence strongly disfavor barring witnesses on competency grounds due to mental incapacity. As we wrote in United States v. Ramirez, 871 F.2d 582, 584 (6th Cir.), cert. denied, 493 U.S. 841, 110 S.Ct. 127, 107 L.Ed.2d 88 (1989):
 
 
 76
 What must be remembered, and is often confused, is that "competency" is a matter of status not ability. Thus, the only two groups of persons specifically rendered incompetent as witnesses by the Federal Rules of Evidence are judges (Rule 605) and jurors (Rule 606). The authority of the court to control the admissibility of the testimony of persons so impaired in some manner that they cannot give meaningful testimony is to be found outside of Rule 601. For example, the judge always has the authority under Rule 403 to balance the probative value of testimony against its prejudicial effect. Similarly, under Rule 603, the inability of a witness to take or comprehend an oath or affirmation will allow the judge to exclude that person's testimony. An argument can also be constructed that a person might be impaired to the point that he would not be able to satisfy the "personal knowledge" requirement of Rule 602. Again though, it is important to remember that such decisions by a trial judge to either admit or exclude testimony will only be reversed for a clear abuse of discretion.
 
 
 77
 (Footnote omitted.)
 
 
 78
 The district court did not rule on Parks' competency before he took the stand; later, in considering a motion for judgment of acquittal, the court indicated that Parks and McKeehan "were not crazy witnesses." Likewise, it addressed the question of McKeehan's mental capacity during a bench conference held after he had begun to testify. The court stated that it had "observed Mr. McKeehan, and he appears to the Court to be sober, cogent. He appears to the Court to know exactly where he is and what he is doing. His testimony has been direct, and his testimony has not been confused." When pressed concerning the psychiatrist's affidavit that McKeehan could not help in his own defense, the court opined that "he sure has made a remarkable recovery ... [His condition is] fodder for cross-examination, and it would appear that either the psychiatrist made an inaccurate diagnosis September the 5th or the witness has made a remarkable recovery. And the Court observes that--repeats that he does not appear to be confused today."
 
 
 79
 At a hearing on defendants' post-trial motions, the district court supplemented its findings regarding Parks' and McKeehan's competency, and the need for a special examination of their mental faculties. The court noted that
 
 
 80
 one of the reasons I overlooked stating as to my belief that an independent evaluation at this time would be a waste of time is that--is that such a finding, even if they found that they were incompetent here in April of 1992, would not be dispositive as to their competence or mental state when they testified in September of 1991 at the trial of this case or at the hearings that we held in August.
 
 
 81
 ....
 
 
 82
 Similarly, even if I had such an opinion from a psychiatrist or psychologist or whoever that gave us an independent opinion that these people were--Mr. Parks and McKeehan were total screwballs, I would--I would find those opinions to have little probative value and of little weight, and I would not--I would not accept them as being--as being conclusive on the matter. And I would not let such opinions override my own judgment after having seen--personally witnessed their performance in court.
 
 
 83
 Hence, the district court did not find that Parks and McKeehan were incapable of understanding their oath and obligation to testify truthfully. Nor did the court find, based on its observations, that their mental abilities were so limited that they did not have sufficient capacity to perceive events, to remember them, and to describe them for the benefit of the trier of fact. See Fed.R.Evid. 602. The court was not required, as Whited would have it, to conduct a special examination into their competency. If either Parks' or McKeehan's behavior raised concerns stemming from Rule 602 or 603, it could have excluded their testimony (or portions thereof) without any examination whatsoever. Furthermore, the court had the additional authority, pursuant to Rule 403, to exclude their testimony in light of their past or present mental state. The court chose not to take any of these measures in the circumstances. Instead, it permitted defense counsel to use the psychiatric records of Parks and McKeehan, as well as other indicia of their mental capacity, to vigorously attack their credibility.
 
 
 84
 After carefully reviewing the record, we conclude that the district court did not abuse its discretion in doing so. As long as a witness appreciates his duty to tell the truth, and is minimally capable of observing, recalling, and communicating events, his testimony should come in for whatever it is worth. It is then up to the opposing party to dispute the witness' powers of apprehension, which well may be impaired by mental illness or other factors. As we are persuaded that Parks and McKeehan were at least minimally capable of offering reliable evidence, the possible weaknesses in their testimony went to its credibility, and so were to be assessed by the jury. See United States v. Moreno, 899 F.2d 465, 469 (6th Cir.1990).
 
 
 85
 Whited also argues that defendants should have been allowed to introduce the psychiatric records of Parks and McKeehan as substantive evidence. They were ruled inadmissible hearsay by the district court. Whited alleges, however, that they were not put forward for the truth of the matters asserted within, but to show how manipulative Parks and McKeehan could be if they were not, in fact, mentally unbalanced. Such use of the records during cross-examination to challenge Parks' and McKeehan's credibility was appropriate. However, we believe that they would have constituted hearsay if employed as part of a substantive defense. They would have to have been offered to show that the psychiatrists making the records actually concluded that Parks and McKeehan were mentally ill. Otherwise, Parks' and McKeehan's deception would have no basis in fact. Consequently, the district court did not err in declining to admit the psychiatric records.
 
 
 86
 F. Restriction on Cross-Examination of Government Agent
 
 
 87
 Finally, Whited asserts that the district court improperly limited defendants' cross-examination of a government witness, Special Agent Clyde Merryman of the FBI. Defense counsel sought to question Merryman about an internal disciplinary investigation that had been resolved in his favor. After a sealed hearing outside the presence of the jury, at which the court placed Merryman under oath and interrogated him about the alleged misconduct, it determined that defendants would be restricted from inquiring into the investigation on cross-examination. Having reviewed the transcript of the hearing and the sealed materials contained in the record, we conclude that the district court did not commit an abuse of its discretion in this regard.
 
 
 88
 Rule 608(b) of the Federal Rules of Evidence (Evidence of Character and Conduct of Witness--Specific instances of conduct) provides in part that
 
 
 89
 Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may ... in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness[.]
 
 
 90
 "The first step in a 608(b) analysis is whether the specific conduct is probative of the witness' character for truthfulness or untruthfulness." United States v. Hill, 550 F.Supp. 983, 990 (E.D.Pa.1982), aff'd, 716 F.2d 893 (3rd Cir.1983), cert. denied, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984). Here, Merryman was not disciplined following the investigation into his conduct, so it had little worth as a challenge to his credibility. Whatever probative value might have attached to the FBI's proceedings was substantially outweighed by prejudice to the government. See Fed.R.Evid. 403.
 
 IV.
 Robert Phibbs
 A. The Voir Dire
 
 91
 Phibbs argues that the district court violated Rule 24(a) of the Federal Rules of Criminal Procedure by refusing to submit a questionnaire developed by defendants to prospective jurors, when the court itself conducted the voir dire of the jury venire.
 
 
 92
 Except for Robert Murr, defendants waived their respective interests in examining the jury venire. According to Phibbs, the other defendants entrusted Murr with undertaking the voir dire to attempt to balance their right to an impartial jury with the district court's concern for expediency. Such a strategy appears to have been partially the result of defendants' fears that the court was leaning towards exclusively examining prospective jurors, and was an effort to devise an alternative procedure more desirable to them. If so, their sense of the court's inclination proved to be accurate.
 
 
 93
 Rule 24(a) of the Federal Rules of Criminal Procedure (Trial Jurors--Examination) states:
 
 
 94
 The court may permit the defendant or the defendant's attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or the defendant's attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.
 
 
 95
 Thus, the trial court may resolve to conduct the voir dire on its own. If the court does so, it may also ask the jury venire other appropriate questions suggested by the parties.
 
 
 96
 In reviewing the district court's handling of the voir dire in the case at bar, we must ascertain whether the court "abused the broad discretion vested in him by the rulings of the Supreme Court of the United States in his impaneling of [the] jury." United States v. Blanton, 719 F.2d 815, 822 (6th Cir.1983), cert. denied, 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984). A trial court "retains great latitude in deciding what questions should be asked on voir dire." Mu'Min v. Virginia, --- U.S. ----, ----, 111 S.Ct. 1899, 1904, 114 L.Ed.2d 493 (1991). So long as the court ensured that the defendant or defendants had "a fair trial by a panel of impartial, 'indifferent' jurors", reversal is not mandated. Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1960).
 
 
 97
 In its examination of the jury venire, the district court drew upon the substance of the questions presented by defense counsel. As the voir dire progressed, the court held bench conferences to address areas of concern highlighted by defendants. At its conclusion, the court asked whether there were any other questions from counsel, eliciting no response.
 
 
 98
 The district court examined the panel members as a group concerning the presumption of innocence, the meaning of "reasonable doubt," their knowledge of the parties and attorneys, and their knowledge of the case. They were also asked about their impressions of the criminal justice system, any predispositions they might have regarding drug prosecutions, whether any of them had prior experience as a juror, whether any of them had been a victim of crime, and whether they could set aside their personal feelings in rendering a verdict. All of these questions, and others, served to establish that the individuals who were ultimately selected as jurors were unbiased.[2]
 
 
 99
 Phibbs suggests that the written questionnaire created by defendants was necessary to ferret out those prospective jurors whose biases would not be revealed through a collective examination.[3] An individualized examination of the jury venire is not, however, required by the United States Constitution. See Mu'Min, --- U.S. at ----, 111 S.Ct. at 1904. Much of the questionnaire was directed at the personal habits and activities of the panel members (e.g., what books they read, what television shows they watched, etc.). While such information might have aided defendants in identifying sympathetic jurors, it was not needed to compose a fair-minded jury. Accordingly, we hold that the district court did not abuse its discretion in its management of the voir dire.
 
 
 100
 Phibbs claims nonetheless that considering the length of the trial was estimated at one month, "a one and one-half voir dire examination was so grossly inappropriate that a fair and impartial jury could not have been seated after such questioning." However, he does not cite any instance of prejudice relative to the jury as a body or to any specific juror. Nor does he point out any question that the court failed to ask that harmed defendants. As a result, we find his contention to be without merit.
 
 
 101
 B. The Presence of Government Agents in the Courtroom
 
 
 102
 Phibbs also asserts that defendants did not receive a fair trial because FBI Special Agent Clyde Merryman and DEA Special Agent Frank Finken, both of whom appeared as witnesses, were allowed to remain in the courtroom throughout the proceedings.
 
 
 103
 Rule 615 of the Federal Rules of Evidence (Exclusion of Witnesses) provides:
 
 
 104
 At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. The rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.
 
 
 105
 In the instant case, the government sought to designate both Merryman and Finken as its representatives during the trial. After a defense objection, the district court replied:
 
 
 106
 I think the rule provides that anyone that was necessary to assist counsel in the presentation of the case would be--would be permitted to remain in the courtroom. Inasmuch as this is an extended trial, boxes of documents both from the Eastern District of Kentucky and the Eastern District [of] Tennessee, it would be unduly burdensome on the Court and time consuming if we just had one case agent. So the request of the Government is not unreasonable, so the motion is overruled.
 
 
 107
 The court then engaged in a colloquy with one of the counsel for the defense, inviting him to bring contrary authority to its attention before any witnesses were called. Counsel did not do so.
 
 
 108
 Hence, the court initially treated both Merryman and Finken as "essential" witnesses under Rule 615(3). Later, however, the court requested that the government designate one of the two as its representative pursuant to Rule 615(2); it would then consider whether the other agent was an "essential" witness. The government responded by selecting Merryman as its representative, and the court found that Finken's presence in the courtroom was also needed for the government to effectively present its case.
 
 
 109
 Phibbs concedes that one of the agents could have stayed in the courtroom, despite the fact that he would later testify. However, he argues that the government had the burden to show that the presence of more than one agent was "essential" to it laying out its case. See Fed.R.Evid. 615.
 
 
 110
 The district court followed our procedure, as set out in United States v. Pulley, 922 F.2d 1283 (6th Cir.), cert. denied, Pulley v. United States, --- U.S. ----, 112 S.Ct. 67, 116 L.Ed.2d 42 (1991), to be used when the government seeks to have two agent-witnesses in the courtroom for assistance. Rule 615(2) affords the government the right to designate only one representative for such a purpose. Id. at 1286. However, certain prosecutions may be complex enough that the aid of more than one law enforcement officer is needed to sort through extensive, technical evidence, and to help "map out strategy." See United States v. Martin, 920 F.2d 393, 397 (6th Cir.1990). When the government wants to have two agent-witnesses in attendance throughout a trial, "it is always free to designate one agent as its representative under subpart (2) [to Rule 615] and to try to show under subpart (3) that the presence of the second agent is "essential" to the presentation of its case." Pulley, 922 F.2d at 1286.
 
 
 111
 Demonstrating that an additional agent[4] is, in fact, "essential" is no easy task. Criminal defendants, as do all persons caught up in the legal process, have a substantial interest in "discouraging and exposing fabrication, inaccuracy, and collusion" related to in-court testimony. Advisory Committee Notes to Fed.R.Evid. 615. This interest was recognized in the text of Rule 615, which made the exclusion of witnesses by the parties a matter of right, subject to exceptions that are narrowly defined.
 
 
 112
 The "essential" witness exception set out in Rule 615(3) "contemplates such persons as an agent who handled the transaction being litigated or an expert needed to advise counsel in the management of the litigation." Advisory Committee Notes to Fed.R.Evid. 615. We are persuaded that Finken fell within this category due to the particular circumstances of the case at bar. This was a trial that was scheduled for approximately one month, involving several defendants and a great deal of evidence, not all of which was readily accessible. After Merryman was designated the government's representative in accordance with Rule 615(2), the court determined that Finken, who was intimately familiar with portions of the evidence, was also needed to advise the government in its handling of the prosecution. As Merryman and Finken were, for the most part, responsible for distinct aspects[5] of a far-flung investigation, this was not an abuse of discretion.
 
 
 113
 We note that the district court took steps to guarantee that Merryman and Finken would not parrot each other's testimony. It directed that, when one of them was on the stand, the other was to be outside the courtroom. Such a measure could be taken, not only on the basis of the court's inherent powers of trial oversight, but also in reliance upon Rule 615 itself. See, e.g., United States v. Womack, 654 F.2d 1034 (5th Cir.1981), cert. denied, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982) (breach of conditions placed on sequestration constitutes violation of Fed.R.Evid. 615).
 
 
 114
 Phibbs, however, asserts that government counsel really wanted Finken and Merryman in court so that they might be in a position to coach Parks during recesses, or to otherwise guide his testimony. He claims that defendants were prejudiced because Merryman had substantial contact with Parks, "and the clear purpose and effect of allowing Agent Merryman to remain in the courtroom was to be able to listen to all of the testimony and to, in fact, cumulatively correct any questionable credibility problems and to bolster the credibility of Mr. Parks[.]" As for Finken, he "also had the opportunity to sit through this testimony and assist Agent Merryman in the 'correction' of Mr. Parks' testimony." Phibbs offers nothing to support his charges, and we find them to be rank speculation.
 
 
 115
 Despite the possibility of improper influence, Rule 615(2) allows the government to have any law enforcement officer it wants at its counsel table. Similarly, Rule 615(3) does not categorically bar any class of agents from assuming "essential" witness status. Ordinarily, if there are concerns about coaching by an agent-witness, the court may order him not to discuss the case with any other witness. If the agent fails to adhere to such an order, the court has a variety of remedies at its disposal, ranging from commenting on the transgression to the jury, to holding the agent in contempt, or disqualifying him as a witness, or even declaring a mistrial.
 
 
 116
 In addition, the defense is free to cross-examine both the agent-witness and the alleged object of his coaching efforts, subject to the control of the court. See Geders v. United States, 425 U.S. 80, 89-91, 96 S.Ct. 1330, 1335-36, 47 L.Ed.2d 592 (1976). See also M. Graham, Federal Practice and Procedure: Evidence § 6611 at 217-221 (West 1992). Here, defendants engaged in spirited cross-examination of Parks, Merryman, and Finken, touching upon the question of coaching.
 
 C. Sufficiency of the Evidence
 
 117
 Phibbs next contends that the evidence underlying his convictions was insufficient, and that the district court erred in denying both his motion for a directed verdict following the government's case-in-chief, and his subsequent motion for judgment of acquittal.
 
 
 118
 Phibbs was convicted of conspiracy to possess cocaine with the intent to distribute the drug (21 U.S.C. § 846), as well as on nine counts of possession of cocaine, or aiding and abetting the possession of cocaine, with the intent to distribute (21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2).
 
 
 119
 Jerry Parks testified that Phibbs, an employee of Robert Murr's, wrote a letter to the United States Probation Office in Memphis, Tennessee, stating that he would employ Parks if he was transferred to Knoxville. Phibbs sent the letter on behalf of Murr because Murr was under investigation by authorities in Knoxville. Their efforts were successful, and Parks was given permission to work for Automotive Enterprises, one of Murr's companies. After Parks began his tenure there, Phibbs represented to Parks' probation officer that he was on the job. However, according to Parks, his employment was a "sham" and "[he] didn't do anything there at Automotive Enterprises other than carrying on Mr. Murr, the Chief's, cocaine business." Phibbs sometimes paid Parks with "sham" checks, which he would then cash, returning the money to Phibbs to put back in the account.
 
 
 120
 After Parks began supplying Murr's cocaine customers with the drug, he often gave Phibbs the money he collected from them if Murr was unavailable. This was done on Murr's express instructions, so that Parks would not be carrying large sums on his person. The amount turned over to Phibbs would frequently be in the neighborhood of $10,000 to $15,000.
 
 
 121
 When, after November of 1988, Murr decided to move the location of the cocaine stash from the house he rented for defendant Diane Whited, he told Parks to bury the drugs inside a pipe on a hillside behind Automotive Enterprises. Parks testified that the only other person "in the world" who knew where the cocaine was subsequently hidden was Phibbs. This was so that, in the event Parks was arrested or injured, "somebody in our organization ... would know."
 
 
 122
 Ernie Nicely, a business partner of Murr's, stated that on two occasions when defendant Kenneth Lawson came to see Murr at Anderson County Auto Auction, ostensibly to discuss matters related to the cocaine conspiracy, Phibbs was "on the property." This was unusual because "[h]e very seldom came out there"; it was 20 miles away from Phibbs' job at Automotive Enterprises. On the last day that Nicely saw Lawson, August 17, 1989, Murr called him and asked him to take two suitcases out of the safe at Anderson County Auto Auction and to deliver them to Phibbs at Automotive Enterprises.
 
 
 123
 Later, in September of 1989, Murr told Nicely that defendant Edward Rogers owed him $2,000, and that Phibbs was to deduct that amount from the $10,000 that he was holding for Rogers. According to Nicely, Rogers owed the money "for drugs or something." Around that time, Murr instructed Nicely to "get rid of " a 1984 Porsche 940 that was on Murr's property until he could get a title for it. Phibbs informed him that Murr had obtained the car in exchange for a kilogram of cocaine. When he titled the Porsche in his own name, Phibbs furnished the money to pay the tax.
 
 
 124
 Rogers' statements at trial corroborated those of Parks and Nicely regarding Phibbs' participation in the drug distribution ring. He confirmed that he owed Murr $2,000 for drugs, and that he went to Phibbs to settle his account. Phibbs claimed that he actually owed $4,000 for four ounces of cocaine. During their conversation, Rogers asked Phibbs if he was "still in business," and Phibbs replied in the affirmative.
 
 
 125
 All of this testimony was buttressed by the government's introduction of records demonstrating that calls were made from Murr-related telephones to Phibbs' residence, his beeper, or to Whited's cellular phone, which was listed in his name, during the periods delineated in the distribution counts.
 
 
 126
 Viewing the evidence in the light most favorable to the government, there was sufficient proof from several sources that Phibbs "knew of, intended to join and participated in" the charged conspiracy. Pearce, 912 F.2d at 161 (6th Cir.1990) (quoting United States v. Stanley, 765 F.2d 1224, 1237 (5th Cir.1985)). He received and processed drug money, helped install Parks as a middleman, and was part of the security surrounding the cocaine stash. As for the distribution counts, Parks' testimony, in particular, indicated that Phibbs handled drug money during the relevant time frames. His contention must therefore be rejected.
 
 
 127
 D. "Minimal" v. "Minor" Participation; Acceptance of Responsibility
 
 
 128
 Phibbs further argues that, at sentencing the district court should have accorded him a four-point reduction in offense level, attendant to a finding that he was a "minimal" participant in the drug ring, rather than a two-point reduction for being a "minor" participant. He also asserts that he was entitled to a two-point reduction for acceptance of responsibility.[6]
 
 
 129
 A district court's factual decisions, such as those related to a defendant's acceptance of responsibility, or his role in the offense, are reviewed under the clearly erroneous standard. United States v. Perry, 908 F.2d 56, 58 (6th Cir.1990). To be clearly erroneous, " 'a decision must strike us as more than just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.' " Id. (quoting Parts and Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir.1988), cert. denied, 493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989)).
 
 
 130
 Application Note 1 to United States Sentencing Guidelines § 3B1.2 (Mitigating Role) states in part that: "Subsection (a) [dealing with minimal participants] applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." With this language in mind, Phibbs latches onto the probation officer's conclusion in his presentence report that "Phibbs gives the appearance, amid all of the co-defendants to be least involved in the group" to contend that he should have been considered a minimal participant. He further claims, in this regard, that he did not have "organizational, managerial or monetary interests in any of the trips to Kentucky to buy cocaine."
 
 
 131
 However, Application Note 2 to U.S.S.G. § 3B1.2 underscores that:
 
 
 132
 It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.
 
 
 133
 The district court, in passing sentence, felt that Phibbs was not merely on the fringes of the drug distribution ring:
 
 
 134
 You knew what the deal was, you knew what the deal was from beginning to end. And I really believe that and I infer you were into it deeper than what the United States was able to prove. The ostrich defense is not applicable in cases like this.
 
 
 135
 In comparing the roles of Whited, whom it considered to be a minimal participant, and Phibbs, the court took Whited's dependence on Murr and the fact that, unlike Phibbs, she was not a repository of drug money to be significant. In its view, these factors placed her "below Phibbs" for sentencing purposes.
 
 
 136
 Our examination of the record convinces us that Phibbs was not the sort of marginal player that the United States Sentencing Commission and Congress conceived of as a minimal participant. He was involved in the drug distribution ring throughout the bulk of its existence, having been entrusted with drug-related funds, as well as critical knowledge concerning the whereabouts of the cocaine supply. Consequently, the district court's conclusion as to his role in the enterprise was not clearly erroneous.
 
 
 137
 Phibbs further contends that he should have been granted a reduction in offense level for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. In a statement furnished to the district court, Phibbs acknowledged that he was aware, or should have been aware, that he was given money that was the product of Murr's cocaine deals. Once Murr was arrested, it became clear to him that the money was, in fact, drug-related. Thus Phibbs avers that he "truthfully admitte[d] the conduct comprising the offense(s) of conviction." Application Note 1(a) to U.S.S.G. § 3E1.1.
 
 
 138
 However, the district court was not so sure. It told Phibbs' counsel that "I have read his statement, and I don't think that the statement even comes close to a contrite heart and acceptance of responsibility." Accordingly, the court denied Phibbs' request for a sentence reduction under U.S.S.G. § 3E1.1.
 
 
 139
 We approve of the court's decision. Phibbs did not even begin to address the scope of the charges on which he was convicted. To the extent that he did, he did not do so in good faith. There was evidence that he understood all along he was collecting tainted money, and that he was enlightened with respect to the magnitude of the drug distribution ring. Rogers' testimony indicated that he continued his criminal conduct after Murr was arrested. In no way did he assist law enforcement authorities in their probe of the ring's activities. Hence Phibbs could not be said to have accepted responsibility for his offenses in a manner contemplated by the federal sentencing guidelines.
 
 V.
 Victor Rojas
 
 140
 A. The Government's Use of Grand Jury and Administrative Subpoenas
 
 
 141
 Rojas contends that the district court erred in allowing the government to employ administrative subpoenas to uncover evidence without a finding of probable cause that a crime had taken place. He also claims that the government abused the grand jury subpoena power by using it to gather additional evidence in support of the previously-returned indictment.
 
 
 142
 After Rojas was arrested on January 9, 1991, he was informed that a sealed indictment had been returned against him on May 2, 1990. His counsel filed motions for discovery and inspection, and received materials including Rojas' telephone records, and those of defendants Kenneth Lawson and Mary Lawson. These records had been subpoenaed after the May 1990 indictment. In addition, his attorney was provided with Rojas' credit card statements, subpoenaed on January 17, 1991, defendant William Baird's telephone records, ordered subpoenaed on June 19, 1990, as well as other items.
 
 
 143
 Rojas subsequently moved to dismiss the indictment based upon the government's alleged abuse of the grand jury subpoena power. He argued that the government improperly utilized this power to obtain materials to supplement the indictment already handed down. The district court denied Rojas' motion after a hearing at which the government represented that the materials in question were secured by way of DEA administrative subpoenas, not grand jury subpoenas.[7] At trial, Rojas, joined by his co-defendants, objected to such subpoenas having been being employed without a demonstration of probable cause before a neutral magistrate.
 
 
 144
 Pursuant to 21 U.S.C. § 876(a) (Subpoenas--Authorization of use by Attorney General):
 
 
 145
 In any investigation relating to his functions under this subchapter with respect to controlled substances ... the Attorney General may subpena witnesses, compel the attendance and testimony of witnesses, and require the production of any records (including books, papers, documents, and other tangible things which constitute or contain evidence) which the Attorney General finds relevant or material to the investigation.
 
 
 146
 The Attorney General may delegate this power to special agents in charge of those criminal investigations covered by the statute. United States v. Hossbach, 518 F.Supp. 759, 765-66 (E.D.Pa.1980) (citing 28 C.F.R. Subpart R, Appendix § 7(a)). The sorts of items that are capable of being procured as a result plainly include the records presently in controversy. Id. at 767 (telephone records); United States v. Mountain States Tel. & Tel. Co., 516 F.Supp. 225 (D.Wyo.1981) (telephone records).
 
 
 147
 Once a targeted individual has been indicted, the government must cease its use of the grand jury in preparing its case for trial. United States v. Breitkreutz, 977 F.2d 214, 217 (6th Cir.1992). It may, however, continue to employ the grand jury process as part of an ongoing investigation, possibly leading to further charges against the subject of the former indictment. Id. Section 876 of title 21 simply furnishes the Attorney General and his delegates with an alternative mechanism for carrying on the investigation. However, unlike the grand jury system, it may also be used to discover evidence related to the charges in the original indictment.[8]
 
 
 148
 Recipients of administrative subpoenas, such as those issued in accordance with 21 U.S.C. § 876, are afforded certain protections under the Fourth Amendment to the United States Constitution. The subpoena has to be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance [would] not be unreasonable." See v. City of Seattle, 387 U.S. 541, 544, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967).
 
 
 149
 If it is a subpoena duces tecum, the government does not have to secure a judicial warrant before service is effectuated. Nonetheless, "the subpoenaed party [must be able to] obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply." Id. at 545, 87 S.Ct. at 1740. See also Donovan v. Lone Steer, Inc., 464 U.S. 408, 415, 104 S.Ct. 769, 773, 78 L.Ed.2d 567 (1984).
 
 
 150
 Should an on-premises search and inspection be required to execute the subpoena, a valid search warrant is needed as a condition precedent if consent is not forthcoming. If, as in the instant case, the subpoena is to be based upon 21 U.S.C. § 876, "and the purpose behind the search [is] ... a quest for evidence to be used in a criminal prosecution," a full probable cause showing is mandatory.[9] United States v. Lawson, 502 F.Supp. 158, 165 (D.Md.1980). See also Michigan v. Tyler, 436 U.S. 499, 508, 512, 98 S.Ct. 1942, 1949, 1951, 56 L.Ed.2d 486 (1978). A showing which only comports with "reasonable legislative or administrative standards", as when regulatory noncompliance is suspected, will not suffice. See Camara v. Municipal Court, 387 U.S. 523, 538, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967). See also Marshall v. Barlow's Inc., 436 U.S. 307, 320, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305 (1978) ("Probable cause in the criminal sense is not required" to undertake administrative search aimed at uncovering civil violations of the Occupational Health and Safety Act).
 
 
 151
 Here, the administrative subpoenas were not directed at Rojas, but rather at third party businesses. As a consequence, he did not have standing to dispute their issuance on Fourth Amendment grounds, unless he could demonstrate that he had a legitimate expectation of privacy attaching to the records obtained. See, e.g., United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). It is evident, however, that Rojas did not have both an actual and a justifiable privacy interest in any of these materials, including his credit card statements and telephone records. See Smith v. Maryland, 442 U.S. 735, 742, 99 S.Ct. 2577, 2581, 61 L.Ed.2d 220 (1979) (in case involving pen register, the Court "doubt[ed] that people in general entertain any actual expectation of privacy in the numbers they dial"); United States v. Miller, 425 U.S. 435, 440-41, 96 S.Ct. 1619, 1623, 48 L.Ed.2d 71 (1976) (records of bank transactions were not "private papers," over which a person could claim ownership or possession, but were business records). The information contained within them was readily accessible to employees during the normal course of business. Rojas therefore lacked standing to challenge the government's use of the subpoenas.[10]
 
 
 152
 The situation would not have been different if the government had infringed upon the constitutional rights of those entities subpoenaed. One generally does not have standing to complain about the breach of another's rights. See, e.g., Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). As it happened, none of the parties subpoenaed was opposed to turning over the requested items.
 
 
 153
 B. Motion In Limine Related to Rojas' Colombian Origins; Motion For Mistrial Based Upon References to Rojas' Colombian Ties
 
 
 154
 Rojas further asserts that the district court should have granted his motion in limine to prohibit the government from mentioning his having been born in Colombia, or from introducing his passport records, which revealed that he had journeyed to Colombia several times, ostensibly to visit relatives, in the three to five years prior to his arrest.[11]
 
 
 155
 Rojas also argues that a mistrial was warranted because of inflammatory references that were made concerning his connections to Colombia. In his view, they were gratuitous and were designed both to arouse ethnic bias and to tap into the jury's presumed eagerness to combat the national drug crisis, including by way of a misguided verdict. See United States v. Solivan, 937 F.2d 1146, 1153-54 (6th Cir.1991) (urging jury to "strike a blow to the drug problem" was "harmful to the constitutional right to a fair trial"); United States v. Doe, 903 F.2d 16, 25 (D.C.Cir.1990) (appeals to racial passion affected jury impartiality). He cites three such references aside from those adverted to regarding his motion in limine.
 
 
 156
 First, the government was allowed to call a federal prisoner, Andres Tealdo, as a witness and to ask him leading questions. This led Tealdo to testify that he knew Rojas in 1989, and that Rojas told him that he sold cocaine from Colombia. Second, the government stated during its closing argument that "Robert Dale Murr could pick up a telephone and arrange for his cocaine broker, the Defendant Kenneth Lawson, to have a Columbian drug dealer, Victor Rojas, bring him kilogram quantities of cocaine by Kentucky by a phone call." Lastly, on cross-examination, Jerry Parks referred to Rojas on one occasion as "Victor Manuel Noriega Rojas." While not a direct reference to his background, Rojas claims that, by implication, it drew attention to his ties to Colombia, a country commonly understood to be a hub in the international drug trade.
 
 
 157
 Motions in limine to exclude evidence are reviewed for an abuse of discretion. We detect no such abuse in the instant case. That Rojas had ties to Colombia and travelled there frequently was relevant to the government's contention that he was the cocaine supplier in the charged conspiracy. We believe that, as proffered for such a legitimate purpose, the complained-about evidence was not unduly prejudicial. See Fed.R.Evid. 403.
 
 
 158
 The denial of a mistrial motion is also assessed under the abuse of discretion standard. Moore, 917 F.2d at 220. Before Tealdo took the stand, the district court and counsel held a lengthy bench conference, during which they discussed the implications of his anticipated evidence. The government expected that Tealdo's testimony would be that Rojas admitted to him that he was a drug dealer whose cocaine source was in Colombia. Significantly, defense counsel objected only on the grounds that this would constitute irrelevant and prejudicial evidence of other "bad acts," relying upon Rule 404(b) of the Federal Rules of Evidence. We are of the opinion that it was properly allowed in and was not, in fact, inflammatory. As a consequence, the portion of the government's closing argument about which Rojas complains had a basis in evidence.
 
 
 159
 As for Parks' calling him "Victor Manuel Noriega Rojas," Rojas suggests that this was harmful because General Noriega's highly-publicized drug trial was underway in Florida at the same time as the instant proceedings. While such a reference was inappropriate, it was an isolated remark and we are satisfied that it did not deprive him of a fair trial. See Bowers, 739 F.2d at 1055. Accordingly, the district court did not err in denying Rojas' motion for a mistrial.
 
 
 160
 C. The Rojas "Photospread"
 
 
 161
 Rojas also alleges that only after the government's examination of witness Vivian Cummins did he first become aware that she had been shown a "photospread" containing his picture as part of her pretrial identification of him. He contends that this violated his right under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny to any exculpatory or impeachment evidence held by the government.
 
 
 162
 The record indicates that Rojas did request such so-called "Brady evidence" in the proper fashion. At side bar, the government averred that defense counsel had been provided with a copy of the photospread "before Ms. Cummins even hit the stand." Whether this was so, we are persuaded that Cummins had a sufficient basis for her pretrial identification of Rojas, independent from any refreshment provided by the photospread. As a result, Rojas' timely mistrial motion need not have been granted.
 
 D. The Confidential Presentence Information
 
 163
 Rojas, on behalf of his co-defendants, next asserts that the district court erred in allowing confidential presentence information to be submitted by the United States Probation Office without affording him an inspection of the materials, and an opportunity to comment as to their import.
 
 
 164
 At a hearing where sentencing matters were discussed, defense counsel asked whether the district judge had any confidential presentence information in his possession. The judge indicated that he did, but maintained that it was not the sort of material he was obligated to divulge:
 
 
 165
 [A]ny information that I may get, directly or indirectly, from the probation officer independent of the presentence report of a confidential nature ... is solely--if any information that I receive from the probation office, directly or indirectly, is for my illumination and my consideration, and it would not be of any--any use or benefit to you or the defendant at all. And that information is exempt.
 
 
 166
 The district judge then overruled counsel's motion, made in accordance with Rule 32(c)(3)(B) of the Federal Rules of Criminal Procedure, for a summary of the confidential information.
 
 
 167
 The information in question was placed under seal, and we examined it. It consisted of nothing more than the probation officer's sentencing recommendations concerning defendants. Pursuant to Fed.R.Crim.P. 32(c)(3)(A), such recommendations are not required to be disclosed to the accused. Consequently, the district court did not withhold any sentencing information that defendants were entitled to examine.
 
 E. Acceptance of Responsibility
 
 168
 Finally, Rojas argues that he should have been given a two-point reduction in offense level under the federal sentencing guidelines for acceptance of responsibility. Rojas asserts that he offered to plead guilty and to acknowledge that he conspired to distribute, and did distribute, the amount of cocaine charged in the indictment. However, according to his attorney, there was a dispute with the government "over Mr. Rojas' remembrance or memory of what quantities came down here on a certain date, and Mr. Parks and Mr. McKeehan's memory." As a result, the government would not enter into a plea agreement with Rojas, and he subsequently went to trial.
 
 
 169
 Rojas claims that, in spite of his desire to admit his wrongdoing, his offense level was not lowered because he did not, in fact, plead guilty. Consequently, he contends that he was penalized for exercising his right to a trial as guaranteed by the Sixth Amendment to the United States Constitution.
 
 
 170
 Section 3E1.1 of the sentencing guidelines (Acceptance of Responsibility) does not inflict an across-the-board penalty upon those defendants who go to court to contest their prosecution. Application Note 2 to the section plainly provides that:
 
 
 171
 Conviction by trial ... does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.
 
 
 172
 It is well established that a penal scheme which extends a benefit to defendants who own up to their conduct does not unconstitutionally burden those who exhibit no remorse. See, e.g., Brady v. United States, 397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970). A plea of guilty is an indication of contrition, so it is not surprising that "leniency is more often granted to defendants who accept responsibility by pleading guilty." United States v. Saunders, 973 F.2d 1354, 1362 (7th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993).
 
 
 173
 The record reveals that Rojas' acceptance of responsibility was not unconditional; he was keenly interested in securing a plea agreement. Rojas' counsel stated explicitly that "because of my understanding that the United States cannot give him any assurance that he will not be prosecuted in any other district, then he is not pleading guilty ... I want to state on the record that he is willing to plea, except for the Government said they would not promise to prosecute him in any other districts." He also complained that the government "[was] not willing to cut [Rojas] one iota" as part of a bargain because, in his view, Rojas' testimony might not resonate with that of Parks and McKeehan. Notwithstanding Rojas' equivocation, the district judge told him that he would "take ... into account" his alleged readiness to concede his culpability. The court need not have done so; that it did demonstrates that its failure to give Rojas an offense level reduction under section 3E1.1 was not punishment for his having stood trial.
 
 
 174
 However, the court ultimately felt that Rojas' refusal to testify against his co-defendants, which may have resulted in the acquittal of one of them, and to adequately divulge information about his superiors in his cocaine supply network was significant. The district court's findings concerning a defendant's acceptance of responsibility for his offense are not to be reversed unless clearly erroneous. Perry, 908 F.2d at 58. "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." Application Note 5 to U.S.S.G. § 3E1.1. Applying such a standard here, we do not believe the district court's particular conclusion as to Rojas was improper.[12]
 
 VI.
 Robert Murr
 A. The Plea Agreement
 
 175
 Murr claims that his convictions should have been dismissed by the district court because he had entered into an earlier plea agreement with the government in the Eastern District of Tennessee. Murr contends that the terms of this agreement precluded his prosecution in the case at bar.
 
 
 176
 On August 17, 1989, Murr was arrested in Knoxville, Tennessee, and was later indicted for cocaine distribution and for using a telephonic device to facilitate such distribution. In January of 1990, Murr agreed in writing to plead guilty to the distribution charges in exchange for the government moving to drop the remaining counts of the indictment at sentencing. The agreement provided in part that:
 
 
 177
 If the defendant complies with the terms of this agreement, the United States will not further charge the defendant in the Eastern District of Tennessee for those non-tax-related offenses of which it presently has knowledge. It is further agreed that the defendant will not be prosecuted in the Northern District of Georgia for any non-tax-related offenses concerning actions involving Bobby Joe Wilson.
 
 
 178
 The last paragraph of the agreement underscored that:
 
 
 179
 The parties further agree that this plea agreement constitutes the full and complete agreement and understanding between the parties concerning the defendant's guilt to the above-referenced charges, and that there are no other agreements, promises, undertakings or understandings between the defendant and the United States.
 
 
 180
 In his motion for dismissal, Murr asserted that the promise that he would not be prosecuted in the Eastern District of Tennessee or in the Northern District of Georgia was actually meant to signify a global resolution of his criminal exposure. He based this assertion on purported representations by government counsel to this effect. Furthermore, according to Murr, it was logical that such was the intention of the parties because the only investigations of his activities known to be underway were in those districts. His counsel supposed that it would not have been reasonable for him to demand that the United States Attorney contact every jurisdiction in which Murr's conduct might possibly be under scrutiny.
 
 
 181
 The district court, however, rejected these arguments. It held that, on its face, Murr's plea agreement did not restrict the government from trying him in the Eastern District of Kentucky on the instant indictment. Its finding is subject to the clearly erroneous standard of review. See United States v. Robison, 924 F.2d 612, 614 (6th Cir.1991).
 
 
 182
 In determining whether a plea agreement has been broken, "the trial court should look to what the defendant reasonably understood" when he entered into the agreement. United States v. Herrera, 928 F.2d 769, 771 (6th Cir.1991). However,
 
 
 183
 [i]t is impossible for a trial judge to properly administer a plea agreement if it consists of secret terms known only to the parties. Furthermore, "a plea bargain itself is contractual in nature and 'subject to contract-law standards.' " ... [W]here Rule 11 procedures were fully adequate, absent extraordinary circumstances, or some explanation of why defendant did not reveal other terms, at least when specifically asked to do so by the court, a defendant's plea agreement consists of the terms revealed in open court[.]
 
 
 184
 Baker v. United States, 781 F.2d 85, 90 (6th Cir.), cert. denied, 479 U.S. 1017, 107 S.Ct. 667, 93 L.Ed.2d 719 (1986) (citations omitted). Hence, as the district court observed, the most persuasive evidence of what a defendant reasonably appreciated as his bargain is found in the plain language of the court-approved agreement.
 
 
 185
 Here, Murr participated in intensive negotiations with the government over a possible plea bargain. He was invited to advise the government of other districts in which he required protection from prosecution so that they might be considered for inclusion in any agreement. In response, Murr raised concerns about his criminal liability in the Northern District of Florida, as well as in the Eastern District of Tennessee and the Northern District of Georgia. However, the ultimate product of the negotiations only contained an agreement not to prosecute him in the latter two venues. This promise was kept.[13] See United States v. Turner, 936 F.2d 221, 225 (6th Cir.1991) (United States Attorney's grant of "criminal immunity" within the Southern District of Florida did not bar prosecution in the Eastern District of Michigan).
 
 
 186
 Murr expressly acknowledged that the plea agreement he struck "constitute[d] the full and complete agreement and understanding between the parties concerning the defendant's guilt to the above-referenced charges, and that there are no other agreements, promises, undertakings or understandings between the defendant and the United States." (Emphasis added.) In doing so, we are satisfied that he comprehended the terms of the agreement. Thus, the district court did not err in finding that they had not been breached.
 
 
 187
 Nonetheless, Murr insisted to the district court that he was lulled by the government into "letting sleeping dogs lie" with regard to other judicial districts where he might be criminally liable. Murr maintained that the government knew or should have known that charges against him were being prepared in the Eastern District of Kentucky. It then "sandbagged" him into not seeking a no-prosecution provision in his plea agreement pertaining to that venue.
 
 
 188
 The district court did not accept Murr's characterization of events. It concluded that the government, and specifically the Assistant United States Attorney who was negotiating with Murr, was unaware of his drug operation reaching into Kentucky until Jerry Parks was debriefed in late February of 1990. The record bears out such a conclusion, as does common sense. It is most unlikely that the government would have agreed to the deal that it did--five years' imprisonment--if it had been apprised of the full extent of Murr's alleged offenses. As the court opined, the burden was on Murr to obtain the best plea bargain that he could. Not surprisingly, he decided to keep silent about his cocaine venture in Kentucky, running the risk that it would eventually be exposed by the government. Unhappily for him, he lost this gamble and was indicted there. As we detect nothing akin to fraud surrounding the construction of the Tennessee plea agreement, the district court was correct in not going beyond its four corners to find that it did not bar Murr's prosecution in the instant case.
 
 B. Sufficiency of the Evidence
 
 189
 Murr next contends that there was insufficient evidence underlying his conviction for having engaged in a continuing criminal enterprise.
 
 
 190
 Five elements comprise a continuing criminal enterprise offense:
 
 
 191
 (1) a felony violation of the federal narcotics law; (2) as part of "a continuing series of violations;" (3) "in concert with five or more persons;" (4) for whom the defendant is an organizer or supervisor; and (5) from which he derives substantial income.
 
 
 192
 United States v. English, 925 F.2d 154, 156 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2810, 115 L.Ed.2d 983 (1991) (quoting 21 U.S.C. § 848(c) (1988)). Viewing the evidence in the light most favorable to the government, we are persuaded a rational trier of fact could have determined that Murr's conduct satisfied these elements beyond a reasonable doubt.
 
 
 193
 The evidence revealed that Murr distributed thousands of dollars worth of illicit narcotics in an ongoing criminal venture. His challenge to his conviction under 21 U.S.C. § 848 primarily rests on his assertion that he did not manage or organize "five or more persons," with whom he acted "in concert." We believe, however, that the government proved that Murr supervised at least six other individuals in such a context: Jerry Parks, Jim Hurt, Diane Whited, Tommy McKeehan, Robert Phibbs, and Ernie Nicely.
 
 
 194
 Jerry Parks was brought to Knoxville through Murr's machinations in order to sell cocaine to his pre-existing customers. Parks did so from August of 1988 until May of 1989. He obtained the drug in Kentucky at Murr's direction and, from January of 1989 until May of 1989, stored it in Knoxville. Murr paid him $500 for each kilogram of cocaine that he transported from Kentucky and $100 for each ounce of the drug that he delivered to Murr's customers.
 
 
 195
 Murr argues that Parks' employment with him could not have been used to support his continuing criminal enterprise conviction because the government was aware that Parks was selling drugs for him in the Eastern District of Tennessee when it entered into its plea agreement with him there. As we have explained, however, this agreement did not shield Murr from prosecution in the Eastern District of Kentucky. In addition, it did not prevent the government from using evidence which it possessed at the time to prove a criminal offense of which it did not then have actual knowledge. See United States v. Sutton, 794 F.2d 1415, 1423 (9th Cir.1986).
 
 
 196
 After Parks was arrested in May of 1989 on a burglary charge, Murr brought in Jim Hurt to take over some of Parks' functions. See United States v. Chalkias, 971 F.2d 1206, 1214 (6th Cir.1992) (approving customers is indication of coordination of another). Hurt sold cocaine to Edward Rogers but, as this cocaine was not of acceptable quality, Rogers stopped buying from Hurt. Murr then began supplying Rogers himself.
 
 
 197
 Murr asserts that Hurt, who stepped into Parks' shoes, could not have been considered a distinct "person" for purposes of 21 U.S.C. § 848. However, as long as the defendant was an organizer or a supervisor of a "larger criminal organization," it is irrelevant that particular underlings came and went and were replaced. United States v. Bafia, 949 F.2d 1465, 1470-71 (7th Cir.1991). See also United States v. Bond, 847 F.2d 1233, 1237 (7th Cir.1988) ("A small time dope dealer who keeps to himself and has a single mule to smuggle the drug into the country is outside the statute's scope. The dealer's need to replace his aide ... would not authorize a CCE prosecution on the theory that the small-timer had one servant in January, a second in February, a third in March, and so on. The organization would never be larger than two."). Here, there was evidence that Murr coordinated a drug distribution enterprise of some dimension. As a result, Hurt could have been counted as a separate "person" who was managed by him.[14]
 
 
 198
 The cocaine that was procured by Murr from September through November of 1988 was stored in the house he rented for defendant Diane Whited. See Chalkias, 971 F.2d at 1214 (storage of drugs in domicile of another implies existence of managerial relationship). Murr placed the drugs under Whited's dominion during that time and, on at least one occasion, she helped Murr and Parks weigh and package them. Parks made 15 to 20 trips to Whited's residence during the fall of 1988 to pick up cocaine which he then sold to Murr's customers. She, in turn, "watched" some of money that was generated from these transactions. She was plainly a supervisee of Murr's.
 
 
 199
 While defendant Tommy McKeehan had his own customers to whom he sold drugs, he was also supervised in many respects by Murr. Each of McKeehan's excursions to Kentucky to buy cocaine, except for one, was arranged by Murr. During the initial trips, McKeehan travelled with Murr and was dependent upon him to get the drugs from defendant Kenneth Lawson and then to give McKeehan his share. Eventually, Murr assigned Parks to accompany McKeehan to Kentucky in his stead. Only the May 1989 trip was put together by McKeehan, after Murr told him it would be all right to bypass Lawson and to contact defendant Victor Rojas directly. "The ordinary meaning of the word 'organizer' does not carry with it the implication that the organizer is necessarily able to control those whom he or she organizes." United States v. Ray, 731 F.2d 1361, 1367 (9th Cir.1984). Although McKeehan had a significant degree of free agency vis-a-vis Murr, Murr facilitated his cocaine purchases; in turn, McKeehan lent support to Murr's efforts and submitted to his authority. Hence, Murr "organized" him in a manner coming within the ambit of 21 U.S.C. § 848.
 
 
 200
 On Murr's instructions, Robert Phibbs helped get Parks' probation transferred to Knoxville so that he might work for Murr in the drug distribution ring. When Parks sold cocaine to Murr's customers, he often gave the money he received in return to Phibbs for safekeeping. Phibbs was also part of the "security system" for concealing the cocaine stash after it was moved from Whited's residence. In case anything happened to Parks, he was the only other person who knew exactly where the drugs were located. After Murr was arrested in August of 1989, Phibbs collected money owed to Murr by defendant Edward Rogers from cocaine purchases made by Rogers. All of these activities suggested that Phibbs was an integral part of Murr's enterprise from September of 1988 through August of 1989.
 
 
 201
 In 1987, Ernie Nicely entered into a partnership with Murr in several ventures. Until their assets were sold in June of 1989, Murr furnished Nicely with some of the proceeds from his drug sales to keep these businesses afloat. However, Murr required Nicely "to cover for half the money," i.e., to take credit for half of the investments, even though all of the money was actually coming from Murr. Nicely understood this money to be drug-related. After the assets of the businesses were liquidated, the proceeds were delivered by Nicely to Phibbs at Murr's direction. As a result, the jury could have concluded that Murr used Nicely to knowingly launder some of the profits from the drug distribution ring. While Nicely may have been unaware of most of the details of Murr's cocaine operation, he clearly knew that Murr was trafficking in cocaine, and that his assistance was being sought in an attempt to squirrel away drug profits. He therefore agreed to the "design or plan" of Murr's venture. United States v. Schuster, 769 F.2d 337, 340 (6th Cir.1985) (citing Jeffers v. United States, 432 U.S. 137, 148-49, 97 S.Ct. 2207, 2214-15, 53 L.Ed.2d 168 (1977)).
 
 
 202
 Accordingly, Murr supervised or otherwise coordinated at least five persons within the framework of a continuing criminal enterprise.[15] Nonetheless, Murr argues that, pursuant to 21 U.S.C. § 848, the government was obligated to prove he acted "in concert" with five other individuals simultaneously; evidence that five or more persons were involved in the enterprise at various times is not enough. He goes on to contend that the participation of the members of the drug distribution ring did not overlap such that he could have been shown to have managed the same five individuals in a series of drug offenses.
 
 
 203
 Every circuit which has considered this argument has rejected it. See Bafia, 949 F.2d at 1470; United States v. Jenkins, 904 F.2d 549, 553-54 (10th Cir.1990); United States v. Ricks, 882 F.2d 885, 891 (4th Cir.1989), cert. denied, 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 841 (1990); United States v. Fernandez, 822 F.2d 382, 386 (3rd Cir.), cert. denied, 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 391 (1987); United States v. Boldin, 818 F.2d 771, 775-76 (11th Cir.1987); United States v. Lueth, 807 F.2d 719, 731 (8th Cir.1986); United States v. Burt, 765 F.2d 1364, 1366 (9th Cir.1985); United States v. Young, 745 F.2d 733, 747 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); United States v. Phillips, 664 F.2d 971, 1034 (5th Cir.1981), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). "The question is whether [the defendant] acted in concert with five as manager or coordinator. It is on this question that the tenure of office of the staff is irrelevant." Bond, 847 F.2d at 1237 (emphasis added).
 
 
 204
 Hence, the government was only required to demonstrate that Murr had a conspiratorial agreement, as part of a design or plan, with each of at least five underlings. The five need not have acted in concert with each other. Bafia, 949 F.2d at 1471 (citing Jeffers v. United States, 432 U.S. 137, 147-49 and n. 14, 97 S.Ct. 2207, 2214-15 and n. 14, 53 L.Ed.2d 168 (1977)). We are convinced that the government met its burden in this regard.
 
 
 205
 Murr further claims that the evidence underlying both his conviction for conspiracy and his distribution convictions was also insufficient. However, Parks' testimony was that he, Murr, and McKeehan made three trips to Kentucky in the fall of 1988 to obtain multi-kilogram quantities of cocaine from Lawson and Rojas. These drugs were then resold by them in Knoxville. In 1989, McKeehan and Parks journeyed to Kentucky on a monthly basis to procure cocaine. With one exception, Murr invested in the acquisition of these drugs, arranged the transactions, and directed the distribution of the drugs in Knoxville. McKeehan essentially gave the same account of Murr's actions at trial. Furthermore, Edward Rogers testified that he was introduced to Parks by Murr, who asked him whether he would be willing to purchase cocaine from Parks. After Parks was arrested, Murr replaced him with Jim Hurt, and when Rogers became dissatisfied with the cocaine sold to him by Hurt, Murr personally supplied Rogers. This testimony, and that of other witnesses, was corroborated by the government's introduction of hotel and telephone records, as well as books taken from Parks, which detailed some of the activities of the drug distribution ring. Such evidence could have led a rational jury to find Murr guilty of those charges on which he was convicted.[16]
 
 C. Bill of Particulars; Jury Instructions
 
 206
 Murr further contends that the district court erred in denying his motion for a bill of particulars naming the five individuals whom he purportedly supervised in a continuing criminal enterprise. He asserts that, in the absence of such information, he was deprived of his ability to prepare a proper defense.
 
 
 207
 "The grant or denial of a motion for a bill of particulars lies within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion." United States v. Rey, 923 F.2d 1217, 1222 (6th Cir.1991). "Proof of abuse of discretion 'requires a showing of actual surprise at trial and prejudice to the defendant's substantial rights by the denial.' " Id. (quoting United States v. Paiva, 892 F.2d 148, 154 (1st Cir.1989)).
 
 
 208
 Absent such a showing, "there is no requirement that an indictment or a bill of particulars identify the supervisees in a [case pursuant to 21 U.S.C. § 848]." English, 925 F.2d at 159 (quoting United States v. Zanzucchi, 892 F.2d 56, 58 (9th Cir.1989)). The statute "does not make the identity of the [persons managed] important"; the government only has to prove that five or more individuals were, in fact, managed by the defendant. United States v. Beverly, 913 F.2d 337, 352-53 (7th Cir.1990).
 
 
 209
 Our task, therefore, is to determine whether Murr was legitimately surprised at the list of alleged supervisees first referred to by the government following the close of its proof. We think that he was not. Tommy McKeehan, Diane Whited, and Robert Phibbs, were co-defendants and were further referred to in pretrial discovery. Jerry Parks and Ernie Nicely, were known by Murr to be government witnesses, and were cross-examined by him at a hearing one month prior to trial. Jim Hurt's name was included in the government's supplemental bill of particulars, filed on September 11, 1991. Murr's ex-wife, Judy, lived with him at times during the life of the conspiracy, and was adverted to in Special Agent Merryman's grand jury testimony, which was provided to Murr as Jencks Act material. See 18 U.S.C. § 3500. As a result, Murr should have been put on notice that any or all of these individuals might be persons whom the government would allege were controlled by him.
 
 
 210
 Murr also claims that the district court erred in refusing to instruct the jury, as requested by the defense, as to which persons could not be considered one of the five predicate supervisees for a conviction under 21 U.S.C. § 848.
 
 
 211
 When it became apparent that Murr's suggested list was unduly long, the court raised the possibility of furnishing the jury with the names of the seven individuals whom the government actually contended were managed by him. Murr's counsel, however, objected to Judy Murr's name being included in this fashion because "we never had the opportunity to even deal with her." The court, feeling it was being "whipsawed," then offered defendants a choice: it would either tell the jury to only consider the seven persons specified by the government, or it would give no other instructions on the matter. When Murr's counsel continued to protest, the court decided not to provide a narrowing instruction.
 
 
 212
 We have not adopted a pattern instruction for the offense of conducting a continuing criminal enterprise. Chalkias, 971 F.2d at 1215 n. 10. The district court stepped into this void by informing the jury, in part, that
 
 
 213
 [t]he terms organizer, supervisor, or manager are to given their usual and ordinary meanings as commonly understood by the public or business community. An organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them in their activity in one operation or enterprise. A supervisory position can be defined as meaning one who manages or directs or oversees the activities of others. In other words, the Government must prove beyond a reasonable doubt that the Defendant Murr was more than just a fellow worker, but likewise Defendant Murr need not be the dominant organizer or manager as long as he was in a managerial position with respect to five other persons.
 
 
 214
 In United States v. Chalkias, we held that a less-detailed instruction than this one was not "so deficient as to constitute plain error." Id. at 1215. There, we were invited to adhere to a ruling by the Ninth Circuit that
 
 
 215
 where the jury had a confusing array of persons presented, some of whom could be counted [as persons managed by a CCE defendant] and some of whom could not be counted, it was plain error to fail to instruct the jury as to who could not count towards [the defendant's] conviction of a continuing criminal enterprise.
 
 
 216
 Id. at 1214 (quoting United States v. Jerome, 924 F.2d 170, 173 (9th Cir.), opinion replaced, 942 F.2d 1328 (9th Cir.1991)).
 
 
 217
 Jerome involved a situation where the government had argued to the jury that the defendant could be viewed as the organizer of his "suppliers" and "the suppliers of his suppliers." 924 F.2d at 172. The Ninth Circuit was of the opinion that this was incorrect as a matter of law, holding that "an organizer within the sense of the statute [is more than] simply being a steady customer." Id. at 173. Accordingly, the district court's lack of an instruction in this regard was troublesome.
 
 
 218
 The circumstances were different in Chalkias; the government did not put before the jury "an erroneous list of persons managed by [the defendant]." 971 F.2d at 1215. Consequently, we determined that the holding in Jerome was not applicable. We also declined to take the position that "failure to give an instruction setting out the persons that could not be considered to have been managed by a CCE defendant is per se plain error." Id.
 
 
 219
 In the case at bar, as in Chalkias, the government did not mislead the jury concerning who, as a matter of law, could be deemed to be a supervisee of Murr's.[17] This leads us to reach the same conclusion as we did there--that the jury was not subjected to undue confusion "in the context of the case as a whole." Id.
 
 
 220
 Murr further suggests that the district court should have instructed the jury that, in order to convict him of directing a continuing criminal enterprise, it had to unanimously determine the identities of the five individuals he supervised or organized. As the jury was under no duty to make such a finding, Murr's argument lacks merit. Id. at 1214 n. 7. See also English, 925 F.2d at 157-58.
 
 
 221
 Additionally, Murr asserts that the district court should have instructed the jury that a mere buyer-seller relationship does not establish one that is supervisory in nature. See Chalkias, 971 F.2d at 1214. However, the evidence adduced at trial indicated that none of the individuals the government contended he managed was in a buyer-seller relationship with him. Therefore, he was not entitled to the requested instruction. See United States v. Canino, 949 F.2d 928, 941 (7th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1701, 118 L.Ed.2d 410 (1992).
 
 
 222
 D. The Government's Disclosure of Brady and Jencks Act Materials
 
 
 223
 Lastly, Murr asserts that the government did not turn over relevant exculpatory and impeachment evidence to defendants in a timely manner, thereby denying them a fair trial.
 
 
 224
 Pursuant to the Jencks Act, 18 U.S.C. § 3500(b), "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified."
 
 
 225
 Furthermore, as a general matter, the government is required "upon request, to give a defendant any exculpatory information the prosecut[ion] may have which is material to guilt or innocence." United States v. Bibby, 752 F.2d 1116, 1125 (6th Cir.1985) (citing Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). Similarly, the accused must be afforded any relevant impeachment evidence. See United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Unlike the Jencks Act, the force of Brady and its progeny is not limited to the statements and reports of witnesses.
 
 
 226
 Murr calls our attention to the following Brady and Jencks Act materials which the defense either did not receive or, in his opinion, did not receive in time to have used effectively at trial: documents reporting suspected wrongdoing by Tommy McKeehan; notes from government-conducted interviews of McKeehan; probation officer Ed Lynn's file on Jerry Parks; forms outlining government payments to Parks and Ernie Nicely; information about Parks' association with an individual named Sam Scruggs in a cocaine distribution scheme; checks made out to Parks by Murr and drawn on Automotive Enterprises; the original of a letter by Robert Phibbs to the United States Probation Office offering Parks a job with Automotive Enterprises; Parks' tape recordings recounting his participation in a variety of drug transactions; Jencks Act material derived from Edward Rogers; and Parks' prison records. Murr contends that, had defendants been able to take advantage of these materials, they might have influenced the jury's assessment of their culpability.
 
 
 227
 The record reveals that defendants were, in fact, able to make use of Parks' tapes at trial, playing portions of them to the jury. Likewise, the defense employed Lynn's file on Parks to conduct a searching cross-examination of the officer.
 
 
 228
 As for Parks' prison records, the government maintains that they were never in the prosecution's control and that it was otherwise unaware of any exculpatory information contained within them. See Bibby, 752 F.2d at 1125 (due process requires only that government, upon request, divulge to defendant relevant exculpatory evidence possessed by the prosecution); United States v. Agurs, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976) (Brady doctrine only covers evidence which prosecution knew or should have known was exculpatory). The government did eventually provide the records to defense counsel just before Parks was cross-examined, and they were exploited accordingly.
 
 
 229
 The government furnished the defense with records concerning payments made to Parks and Nicely stemming from their respective service as informants. Other memoranda were given to the district court under seal because they included information regarding their whereabouts following their relocation by the government. The court reviewed these documents in camera and determined they had no impeachment value beyond those materials which defendants already had obtained. Our own examination of the memoranda confirms this. Their suppression did not act to "undermine confidence in the outcome" of the instant case. Bagley, 473 U.S. at 678, 105 S.Ct. at 3381.
 
 
 230
 With regard to the Phibbs letter and the checks made out to Parks by Murr, government counsel stated to the district court that these materials only "came to [his] attention" after the discovery deadline had passed. He then promised to turn them over to defendants. When the government could not find the original Phibbs letter, it sought to introduce a copy into evidence; the district court sustained a defense objection to the copy being admitted. While there are conflicting accounts of whether the checks were, in fact, furnished to the defense, Murr was able to introduce into evidence an Automotive Enterprises check written out to Parks by Phibbs, and had the opportunity to cross-examine Parks about the check. Assuming, arguendo, that defendants did not receive the checks, the totality of the evidence presented convinces us there was not a reasonable probability that, had they been disclosed, the results of the trial would have been different. See Pennsylvania v. Ritchie, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987).
 
 
 231
 Government counsel and Special Agent Merryman interviewed McKeehan before trial regarding his drug dealing. McKeehan did not, however, adopt the notes that were taken at these interviews as "substantially verbatim to the statement[s] given [by him]." United States v. Williams, 962 F.2d 1218, 1224 (6th Cir.), cert. denied, Williams v. United States, --- U.S. ----, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992) (quoting United States v. Arnold, 890 F.2d 825, 829 (6th Cir.1989)). As a result, they did not constitute Jencks Act material.
 
 
 232
 The defense also requested information concerning McKeehan's plea agreement with the government, and any investigations of criminal wrongdoing on his part touched upon by the agreement. In response, defendants were provided with copies of the agreement, which named 16 judicial districts where the government had afforded McKeehan protection from prosecution. In addition, they were given copies of both McKeehan's "rap sheet" and an affidavit from his treating psychiatrist.
 
 
 233
 The government went on to describe to defendants two incidents of cocaine transportation which explained the inclusion of most of the 16 districts in McKeehan's plea agreement. Defendants, however, asked for additional information which would account for the remaining districts; in particular, they sought the results of a Tennessee grand jury investigation into McKeehan's activities. Government counsel asserted that it was not required to divulge evidence concerning "suspected" wrongdoing or ongoing criminal investigations. He then represented to the district court that the government had disclosed all "tangible" records of established wrongdoing, i.e., McKeehan's criminal history and misconduct acknowledged by him as part of his plea bargain.
 
 
 234
 Evidence in the prosecution's files related to the "suspected" wrongdoing of a witness must be made known to the defendant if it is favorable to the accused and is material to the question of his guilt or innocence. See Bagley, 473 U.S. at 676, 105 S.Ct. at 3380. The Supreme Court, in construing the government's obligations under Brady v. Maryland and its offspring, has drawn no distinction between such evidence and that pertaining to proven or admitted criminal behavior.
 
 
 235
 Frequently, though, evidence associated with "suspected" wrongdoing will not be admissible even for impeachment purposes, having no bearing on the capacity for truth of any witness. Furthermore, even if logically relevant, its prejudicial effect may nonetheless substantially outweigh its probative value, thus pointing towards its exclusion. See Fed.R.Evid. 403. Additionally, its probative value may be eclipsed by the likely harm resulting from its public revelation, such as to persons embroiled in the case, or to others, or to the success or direction of a continuing official investigation. However, in the unusual instance that its suppression acted to deny a defendant a fair trial, reversal is mandated. See Bagley, 473 U.S. at 678, 105 S.Ct. at 3381.
 
 
 236
 Here, we are satisfied that defendants were accorded the lion's share of any evidence the government had that properly could have been used to impeach McKeehan. The defense incisively cross-examined him on the basis of this evidence. We do not feel the outcome of the proceedings would have been altered if defendants had been privy to the information which was withheld from them.
 
 
 237
 In the case of Rogers, defendants were furnished with copies of his plea agreement, which memorialized his guilty plea to the conspiracy charged in the case at bar, as well as to a RICO charge flowing from a pending investigation in the Eastern District of Tennessee. They were also given copies of Rogers' "rap sheet," information regarding sundry other "bad acts" committed by him, and copies of five reports of government interviews with him.
 
 
 238
 The government did not, however, provide the defense with transcripts of FBI interviews with Rogers concerning his awareness of facts pertinent to the Tennessee RICO investigation. These documents were filed under seal with the district court, which found that they did not contain exculpatory information. We concur with the court's decision not to compel the release of this material.
 
 
 239
 The information concerning Parks' transportation of cocaine for Sam Scruggs in the summer of 1988, just prior to the time he joined the charged conspiracy, was also kept under seal by the district court. Much of it probably would not have been admissible as probative of Parks' character for truthfulness. See Fed.R.Evid. 608(b). At most, if disclosed to the defense, it would have constituted cumulative impeachment evidence. Accordingly, its suppression does not require that defendants' convictions be vitiated. Having thus concluded that the district court's handling of defendants' Brady and Jencks Act concerns was appropriate, Murr's contention must be rejected.
 
 
 240
 AFFIRMED.
 
 
 
 *
 The Honorable David D. Dowd, Jr., United States District Court for the Northern District of Ohio, sitting by designation
 
 
 [1]
 Huckelby asserts that no evidence was adduced that he was present in the Eastern District of Kentucky during the life of the conspiracy. This, however, is of no moment. Venue lies in any district in which an overt act was committed in furtherance of the charged conspiracy. See United States v. Turner, 936 F.2d 221, 226 (6th Cir.1991)
 
 
 [2]
 In addition, the district court permitted defendants to utilize a total of 26 peremptory challenges
 
 
 [3]
 Each member of the jury venire did fill out the official juror's questionnaire form
 
 
 [4]
 Unlike Fed.R.Evid. 615(2), Rule 615(3) does not restrict the number of witnesses who may be deemed "essential to the presentation of [a] party's cause."
 
 
 [5]
 Finken was the case agent in Kentucky, while Merryman was stationed in Tennessee
 
 
 [6]
 Since all appropriate arguments of one defendant have been adopted by the other defendants, the government assumes that Huckelby and Whited joined in Phibbs' argument concerning acceptance of responsibility, and that Huckelby joined in his argument regarding a sentence reduction for minimal participation in concerted activity. We do not make such an assumption, since these issues are largely fact-specific and are not common to the group
 
 
 [7]
 Our review of the record confirms that the subpoenas in controversy were, indeed, administrative subpoenas. Accordingly, we need not address Rojas' grand jury-related argument
 
 
 [8]
 It is also distinct from Rule 17(c) of the Federal Rules of Criminal Procedure (Subpoena--For Production of Documentary Evidence and of Objects)
 
 
 [9]
 In such a context, the reasonableness of giving the warrant without advance notice to the subject and an opportunity to be heard is to be analyzed consistent with those Fourth Amendment principles applicable to criminal warrants
 
 
 [10]
 Rojas' co-defendants were likewise devoid of standing
 
 
 [11]
 At the time of his arrest, Rojas was a legal alien residing in New Jersey
 
 
 [12]
 Although Rojas has joined in the arguments of the other defendants, we do not consider Rojas to have challenged the sufficiency of the evidence supporting his convictions. Such a contention is generally unique to any given defendant. As it is not our function to craft an appellant's arguments, he may not simply "join" the briefs of his co-defendants on this issue
 
 
 [13]
 It may have been nothing more than good fortune for Murr that this was so. "[I]t is unclear that a United States Attorney in one judicial district has the power to bind another United States Attorney in another judicial district." United States v. Turner, 936 F.2d 221, 225-26 (6th Cir.1991)
 
 
 [14]
 Murr asserts that, as the government's theory that Hurt was a supervisee of his was never advanced in front of the grand jury, there was a fatal variance between the indictment and the evidence introduced at trial. As a result, Murr argues that he was denied his Fifth Amendment right to be tried only upon those offenses which were first presented to a grand jury. The Supreme Court has concluded that an indictment is sufficient "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). It is "generally sufficient if it sets forth the words of the statute itself, as long as the statute itself adequately states all of the elements of the offense." United States v. Paulino, 935 F.2d 739, 750 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 883, 116 L.Ed.2d 787 (1992). Here, the indictment emanating from the grand jury tracked the statutory language of 21 U.S.C. § 848, without naming any of the five persons purported to have been organized or managed by Murr. However, we have held in regard to a conspiracy charge that "it is the grand jury's statement of the 'existence of the conspiracy agreement rather than the identity of those who agree' which places the defendant on notice of the charge he must be prepared to meet." United States v. Piccolo, 723 F.2d 1234, 1239 (6th Cir.1983) (en banc) (quoting United States v. Davis, 679 F.2d 845, 851 (11th Cir.1982)). Similarly, with a continuing criminal enterprise offense, there is no requirement that the indictment set out the identities of five alleged supervisees; the government need only demonstrate at trial that five or more persons were, in fact, supervised. Murr also asserts that his Fifth Amendment rights were violated when the government did not pursue before the petit jury its theory, which it had put to the grand jury, that L.D. Welch and Conrad Schultz were part of his criminal enterprise. To Murr, this constituted an improper modification of the indictment. However, it is well established that a "variance between the broad allegations in the indictment and the narrower proof at trial" is acceptable so long as "the offense proved was fully contained within the indictment." United States v. Miller, 471 U.S. 130, 137, 105 S.Ct. 1811, 1816, 85 L.Ed.2d 99 (1985). Such was the situation here
 
 
 [15]
 The government had also asserted that Murr's ex-wife, Judy Murr, was controlled by him. In ruling upon Murr's motion for judgment of acquittal, the district court found that there was "no direct evidence that she was consciously a part of the drug conspiracy or did anything in furtherance of the conspiracy." After reviewing the record, we concur in the court's holding
 
 
 [16]
 Murr especially takes issue with his convictions on count two (possession of cocaine with intent to distribute, or aiding and abetting the same, on or about August 25, 1988) and count nine (possession of cocaine with intent to distribute, or aiding and abetting the same, on or about May 8 or 9, 1989) of the indictment. With regard to count two, there was evidence that Murr planned to obtain four kilograms of cocaine from Lawson near Lexington, Kentucky, on the date charged. However, the transaction did not come off because Parks, who was carrying the money, was delayed in reaching the Kentucky rendezvous site. The deal was ultimately consummated after other arrangements were made. It was reasonable to infer that when Murr met with Lawson on August 25, one or both of them possessed the cocaine, though the exchange did not actually take place on that date. Even if the cocaine was exclusively in Lawson's possession, liability could be imputed to Murr as a co-conspirator under Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). As for count nine, the evidence showed that Parks and McKeehan travelled to Kentucky to acquire one kilogram of cocaine, which was brought by McKeehan with his own money. However, Murr set up the purchase and sent Parks, his subordinate, to accompany McKeehan on the trip. Furthermore, after Parks and McKeehan returned to Knoxville, Tennessee, about half of the kilogram of cocaine was conveyed to Parks on Murr's behalf because their supply of the drug had run out. This was supported by Parks' seized drug records, which showed that he had "borrowed" approximately 16 ounces of cocaine from McKeehan in May of 1989. Thus, there was sufficient evidence to sustain Murr's conviction on count nine
 
 
 [17]
 In passing upon Murr's motion for judgment of acquittal, the district court found there was insufficient evidence that Judy Murr was managed by Murr. The jury, however, was not categorically misinformed about her conduct as was the jury in Jerome. In that case, the Ninth Circuit held that persons who have the status of suppliers cannot be said to have been "organized" by their customers. Nothing that Judy Murr supposedly did to advance the charged conspiracy put her in a similar position