16 F.3d 1222
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Sandy MUSSER, Defendant-Appellant.
 No. 93-4105.
 United States Court of Appeals, Sixth Circuit.
 Feb. 22, 1994.
 
 Before: KENNEDY, JONES and SUHRHEINRICH, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant was convicted by a jury of conspiracy to commit an offense or to defraud the United States in violation of 18 U.S.C. Sec. 371, aiding and abetting wire fraud in violation of 18 U.S.C. Secs. 2, 1343, and aiding and abetting theft of government property in violation of 18 U.S.C. Secs. 2, 641. The defendant appeals the denial of her motion for judgment of acquittal arguing that there was insufficient evidence to support her convictions. As a condition of her supervised release, the sentencing court prohibited the defendant from any direct or collateral involvement in obtaining adoption records. The defendant also appeals this restriction. For the reasons stated below, we affirm.
 
 I.
 
 2
 Defendant Sandy Musser is the founder of and directs the Musser Foundation, a private, for-profit entity, which provides various adoption-related services. The defendant hired professional "searchers" to identify and locate adopted children and birth parents on behalf of Musser Foundation clients who pay for these services. Co-defendant Barbara Moskowitz, a friend and business associate of the defendant's, provided "search" investigations for a fee for various individuals, including the Musser Foundation. Moskowitz agreed to conduct searches for adoptees for which the defendant would pay her a $75.00 non-refundable expense fee, as well as another $600.00 upon completion of the search. For these services, the adoptee would pay the defendant, d/b/a the Musser Foundation, up to $2500.00. The business relationship between the defendant and Moskowitz included searches on behalf of birth mothers to locate their adopted children. For these searches, Musser paid Moskowitz $1000.00 while the birth mothers paid the defendant up to $2500.00. Eventually, the defendant asked Moskowitz to provide social security numbers alone, for which the defendant paid Moskowitz $100.00 each. J.App. at 183.
 
 
 3
 Moskowitz, using a phony name and identity, often called state courts or vital record offices to obtain information for her adoption searches. From these calls, she received various information, including social security information. In fact, Moskowitz made hundreds of pretext calls to the Social Security Administration's field offices in order to acquire current addresses or employment information for her searches.[1]
 
 
 4
 In 1989, Thomas Flavin, an investigator with the New York State Department of Health, suspected leaks of confidential adoption records to unauthorized people. Flavin suspected professional adoption searchers were calling vital record units and impersonating government employees in order to obtain adoption information. In particular, FLavin knew that a professional adoption searcher from Cleveland had been making such calls in New York.
 
 
 5
 Flavin watched a television program on reunited adoptees, in which defendant Musser appeared and advertised her adoption services. During this appearance, Musser mentioned that one of her key searchers was from Cleveland. Believing that Musser's star searcher may be the same Cleveland searcher who was working in New York, Flavin contacted the Musser Foundation and spoke with defendant about her services and fees. Subsequently, Flavin created fictitious adoption search information in order to have the defendant conduct traceable adoption searches. During Flavin's contact with the defendant regarding these fictitious adoption searches, the defendant made several remarks indicating she knew that part of the adoption searches were conducted illegally.[2]
 
 
 6
 As a result of his investigation of the fictitious adoption information supplied to the Musser Foundation, Flavin believed that the defendant and Moskowitz were using social security information for their adoption searches. Investigator Flavin then involved special agent Frederick W. Harms from the Office of the Inspector General for the United States Department of Health and Human Services. Harms obtained computer records of any social security inquiry for the reunited adoptees/birth parents listed in the Musser Foundation's brochure. Additionally, Harms obtained computer records of any social security inquiry for the fictitious people and social security numbers that Flavin created and submitted to the Musser Foundation. Harms then acquired telephone toll records for Moskowitz, the Musser Foundation, the defendant, and a Musser client, Shirley Cherrington. Harms compared the telephone records with the computer inquiry records, and compiled summary charts matching inquiries on specific names with telephone calls from Moskowitz to the social security field office initiating the inquiry. A comparison of telephone records between the defendant and Moskowitz indicated that telephone calls were placed contemporaneously with the social security search activity.
 
 
 7
 On March 26, 1993, a federal grand jury in Cleveland, Ohio returned a thirty-nine count indictment against Moskowitz and the defendant. Count one alleged a conspiracy to defraud the United States and to commit various offenses against the United States in violation of 18 U.S.C. Sec. 371. Counts 2 through 23 charged Moskowitz with wire fraud and the defendant with aiding and abetting wire fraud in violation of 18 U.S.C. Secs. 2, 1343. Counts 25 through 28 alleged mail fraud in violation of 18 U.S.C. Sec. 1341 and counts 29 through 38 alleged the theft of government property and aiding and abetting theft from specific social security files in violation of 18 U.S.C. Secs. 2, 641. The defendant was not indicted on counts 24 or 39.
 
 
 8
 Moskowitz pled guilty to all applicable counts and defendant pled not guilty to all counts. At trial, the United States withdrew seven counts of aiding and abetting wire fraud, and two counts of aiding and abetting theft of government property.
 
 
 9
 A jury acquitted the defendant on all counts of mail fraud and convicted the defendant on the conspiracy count, all remaining aiding and abetting wire fraud counts and all remaining counts for aiding and abetting theft of government property. The defendant moved for an acquittal which the District Court denied. Defendant was sentenced to four months of imprisonment and three years of supervised release. As a condition of supervised release, the sentencing court prohibited the defendant from directly or collaterally obtaining adoption records. This timely appeal followed.
 
 II.
 
 10
 The defendant challenges the sufficiency of the evidence of guilt for the verdicts against her. On appeal, the standard of review for claims of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Evans, 883 F.2d 496, 501 (6th Cir.1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).
 
 
 11
 The jury found the defendant guilty of one count of conspiracy to commit an offense or to defraud the United States.
 
 
 12
 The elements of the crime of conspiracy are:
 
 
 13
 (1) that the conspiracy described in the indictment was willfully formed, and was existing at or about the time alleged; (2) that the accused willfully became a member of the conspiracy; (3) that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged.
 
 
 14
 United States v. Sturman, 951 F.2d 1466, 1474 (6th Cir.1991), cert. denied, 112 S.Ct. 2964 (1992) (quoting United States v. Meyers, 646 F.2d 1142, 1143-44 (6th Cir.1981)). The existence of a conspiracy to violate federal law may be established by a tacit or mutual understanding among the parties. United States v. Blakeney, 942 F.2d 1001, 1010 (6th Cir.1991), cert. denied, 112 S.Ct. 881 (1992). However, "mere association with conspirators is not enough to establish participation in a conspiracy." Id. (quoting United States v. Pearce, 912 F.2d 159, 162 (6th Cir.1990)).
 
 
 15
 The jury also found the defendant guilty of aiding and abetting wire fraud and aiding and abetting theft of government property.[3] 18 U.S.C. Secs. 2, 641, 1343. "To be found guilty of the crime of aiding and abetting a criminal venture [18 U.S.C. Sec. 2], a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed." United States v. Knox, 839 F.2d 285, 294 (6th Cir.1988), cert. denied, 490 U.S. 1019 (1989).
 
 
 16
 Defendant argues that the District Court should have granted her motion for acquittal because insufficient evidence supports the verdict against her. Specifically, the defendant argues that she did not know that Moskowitz was unlawfully obtaining information from social security offices and therefore did not conspire with Moskowitz or aid and abet Moskowitz.
 
 
 17
 Viewing the evidence in the light most favorable to the government, we conclude that the evidence supports a finding that the defendant knew of Moskowitz' illegal activities. First, Investigator Flavin tape-recorded several conversations with the defendant in which the defendant indicated that the Musser Foundation and its adoption searchers were using illegal methods to obtain adoption information. See n. 2. Second, on one occasion, the defendant agreed to create a three-way conference call between a New York hospital, the Musser Foundation and Moskowitz in order to facilitate a fraudulent attempt to obtain confidential patient information. See n. 1. Third, Moskowitz testified that the defendant hired her to perform searches for social security numbers alone. Fourth, the use of social security numbers in the fictitious adoption search was discussed during a three-way conference call between the defendant, Moskowitz and Investigator Flavin.[4] Fifth, after receiving a complaint from a client/birth mother that she was unable to locate her daughter with the information provided, the defendant called the client back within an hour with information of the daughter's married name, current place of employment, and telephone numbers for work and home. J.App. at 135. Finally, the defendant provided similar information regarding William Nestor to a client. The birth mother called Elizabeth Nestor, William's adopted mother, and relayed the information provided by the Musser Foundation. This information included William's complete employment history and extensive personal information regarding the Nestors.
 
 
 18
 This evidence is primarily circumstantial. However, "even circumstantial evidence standing alone may sustain a conviction so long as the totality of the evidence was substantial enough to establish guilt beyond a reasonable doubt." United States v. Phibbs, 999 F.2d 1053, 1064 (6th Cir.1993). Viewing the evidence in the light most favorable to the government, the evidence was substantial enough that a rational trier could have found the defendant guilty of conspiracy beyond a reasonable doubt and aiding and abetting wire fraud and theft beyond a reasonable doubt.
 
 
 19
 Alternatively, the government argues that the jury could also have properly convicted defendant of wire fraud and theft of government property under the doctrine of Pinkerton v. United States, 328 U.S. 640, 646-47 (1946). "The Pinkerton doctrine permits conviction of a conspirator for the substantive offenses of other conspirators committed during and in furtherance of the conspiracy." United States v. Martin, 920 F.2d 345, 348 (6th Cir.1990), cert. denied, 111 S.Ct. 2038 (1991). Because we conclude that a rational trier of fact could find sufficient evidence of a conspiracy and aiding and abetting wire fraud and theft of government property, we do not address this argument.
 
 III.
 
 20
 At sentencing, the court prohibited the defendant from obtaining directly or collaterally any adoption records while she was on supervised release. The defendant contends that the sentencing court abused its discretion in imposing this limited occupational restriction because the sentencing court failed to make the necessary findings prior to imposition of the occupational restriction.
 
 
 21
 As a special condition of supervised release, the United States Sentencing Guidelines ("U.S.S.G.") authorize the sentencing court to impose an occupational restriction at its discretion. See U.S.S.G. Secs. 5F1.5, 5B1.4(b)(22), 18 U.S.C. Sec. 3563(b). Section 5F1.5 provides:
 
 
 22
 (a) The court may impose a condition of probation or supervised release prohibiting the defendant from engaging in a specified occupation, business, or profession, or limiting the terms on which the defendant may do so, only if it determines that:
 
 
 23
 (1) a reasonably direct relationship existed between the defendant's occupation, business, or profession and the conduct relevant to the offense of conviction; and
 
 
 24
 (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted.
 
 
 25
 (b) If the court decides to impose a condition of probation or supervised release restricting a defendant's engagement in a specified occupation, business, or profession, the court shall impose the condition for the minimum time and to the minimum extent necessary to protect the public.
 
 
 26
 Defendant argues that the sentencing court failed to make the necessary findings prior to imposition of the occupational restriction. We disagree.
 
 
 27
 At sentencing, the defendant stated,
 
 
 28
 [S]omehow we need, as a country, to look at these sealed records. Adoptees all over the country are in need of medical information; people are dying because they don't have the answers they need. In a country that prides itself on being a free country, something is very wrong with this picture and we should be cooperating and helping instead of punishing and prosecuting. Thank you.
 
 
 29
 Appellee's Br. at 28 (quoting Sentencing Tr. at 15).
 
 
 30
 In response, the District Court said,
 
 
 31
 What you have said today is what you said during the trial. It is a sense of saying: I know that the law existed and I feel that it must be changed. And in changing it, if I must violate it to change it, I will violate it.
 
 
 32
 There is no sense of what we sometimes refer to as remorse for having done so. You have felt apparently yourself justified ...
 
 
 33
 But I want to make it clear that any sentence in which the court is involved related and refers to your desire and your activity in intruding into the privacy of the Social Security files.
 
 
 34
 Although your feelings are a very strong one, there is, I'm sure, an equally strong view that those records should be kept silent, and the United States Congress has agreed with that view.
 
 
 35
 Id. at 29 (quoting Sentencing Tr. at 17).
 
 
 36
 We conclude that the District Court's statements at sentencing establish that the court found a reasonably direct relationship existed between the defendant's occupation and the conduct constituting the offense. Indeed, a finding to the contrary would be clearly erroneous. Further, the defendant lacked remorse throughout the trial and at sentencing. We conclude that the District Court's statements at sentencing also establish that it believed that the defendant felt justified in her criminal activity and a restriction on obtaining adoption records was necessary to protect the public from further crimes. Finally, restricting the defendant from directly or collaterally conducting adoption searches for the entire period of her supervised release, the District Court appears to impose the restriction for the minimum time and to the minimum extent necessary to protect the public as required by U.S.S.G. Sec. 5F1.5(b). While the District Court's statements at sentencing were sufficient for us to reach these conclusions, the District Court should in the future explicitly state its findings and analysis as to each guideline requirement.
 
 IV.
 
 37
 For the reasons stated, we AFFIRM.
 
 
 
 [1]
 On one occasion, Moskowitz impersonated a physician, Dr. Franklin, to attempt to obtain information from a New York state hospital. However, Moskowitz was unable to obtain the desired information without first providing the hospital with a call-back number. Defendant suggested that Moskowitz give the Musser Foundation 800-prefix telephone number to the hospital. Moskowitz asked the defendant if she was afraid but the defendant replied that, "if I go to jail, I'll just write my book." Defendant planned to create a three-way conference call so that Moskowitz, as Dr. Franklin, could converse with the hospital. However, the three-way conference call could not be established
 
 
 [2]
 The following is a transcript of the recorded conversation between Flavin and Musser on April 11, 1990
 Flavin: I've always been told, that this information was sacrosanct and ah, well, very confidential, and I didn't know whether anybody could get it or not.
 Musser: Yeah.
 Flavin: Ok, so--
 Musser: Well, it is, but what we have managed to do is beat the system.
 Flavin: You can beat the system, huh?
 Musser: Ha, ha, ha, ha (laughing).
 Flavin: Alright! Ah, is this, is this legal?
 Musser: Well, we're not sure about that....
 ....
 Musser: [S]omebody might say what we're doing is illegal, but--we're trying to correct the system, is what we're trying to do.
 J.App. at 285.
 April 11, 1990 conversation, continued
 Musser: Ok, well, we started out as a support organization, which is what ALMA is and what a lot of other organizations are, which means that they offer support to individuals and will try to help them as much as I can with trying to tell them how to, you know, work within the system as far as writing to the agency and getting non-identifying information and that kind of thing.
 Flavin: I see.
 Musser: We have taken, gone one step further and saying we are actively searching, you know, we have people who can--who can get the job done.
 Flavin: Uh, huh.
 Musser: And that's basically what we have found that people really want.
 Flavin: I see.
 Musser: So, while we always offered support, we're now offering, you know, something more.
 Flavin: Ok, and ah, you work within your law (laughing).
 Musser: (Laughing) within our law, yeah.
 Flavin: You already said you don't recognize the--
 Musser: Our own law--right.
 Flavin: The legality of sealed records....
 J.App. at 287.
 Conversation April 25, 1990
 Flavin: Ok, yeah, because I'm, I'm, just, you know, morbidly curious about the--I'm fascinated by it to tell you the truth, and I didn't think anything like this existed cause as I think I told you before, I always felt that this was almost impossible, to--
 Musser: Well, most people do, and we did too until we finally just decided to take the bull by the horns and go, you know. Much of the work was being done, ah, you know, underground up until, up until recently.
 ....
 Musser: Yeah, we just finally said hey, you know, we believe in this even though it may be civil disobedience, we believe in it--
 J.App. at 298-99.
 Conversation April 25, 1990 continued
 Flavin: Now, you had mentioned civil disobedience. I'm glad you mentioned that, because I had, ah, one thing in the back of my mind. Can I get into any trouble by hiring you guys?
 Musser: (laughing).
 Flavin: I don't want to go to jail.
 Musser: I don't think so. If anybody goes to jail, it will be me.
 J.App. at 300.
 
 
 [3]
 All of the wire fraud charges related to telephone calls from Moskowitz to the Social Security Administration offices for information on behalf of the defendant's clients. All of the theft charges related to the fraudulent acquisition of confidential social security information for individuals sought on behalf of the defendant's clients
 
 
 [4]
 The following is an excerpt from a conversation between Moskowitz, Flavin and the defendant on July 20, 1990
 Moskowitz: I'm still working on your case. I had gotten all the information, which I thought was gonna just, you know, put everything into place. I even got the parent's names and their Social Security numbers, and it turns out that the numbers just don't go to anyone any longer....
 J.App. at 317.
 Later in the conversation,
 Flavin: O.K., ah, you, you say you got Social Security numbers?
 Moskowitz: Well, they, they didn't go anywhere.
 Flavin: Oh.
 Moskowitz: They're not good numbers.
 Flavin: Huh, how do you check them?
 Moskowitz: Well, we, we have different sources that we can use.
 Flavin: I see.
 J.App. at 318.